106 T.C. No. 3


UNITED STATES TAX COURT


JAMES H. SWANSON AND JOSEPHINE A. SWANSON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 21203-92.              Filed February 14, 1996.


        Ps filed a motion for reasonable litigation costs
pursuant to Rule 231, Tax Court Rules of Practice and
Procedure, and sec. 7430, I.R.C., claiming that R was
not substantially justified in determining that:  (1)
Prohibited transactions had occurred under sec. 4975,
I.R.C., with respect to a domestic international sales
corporation, a foreign sales corporation, and two
individual retirement accounts; and (2) the sale of Ps'
Illinois residence to P's closely held corporation was
a sham transaction.
        1.  <u>Held</u>:  R was not substantially justified with
respect to the first issue, but was substantially
justified with respect to the second issue.
        2.  <u>Held</u>, <u>further</u>, net worth, for purposes of the
Equal Access to Justice Act, 28 U.S.C. sec.
2412(d)(2)(B) (1994), as incorporated by sec.
7430(c)(4)(A)(iii), is determined based upon the cost
of acquisition rather than the fair market value of

assets, and was less than $2 million each with respect to Ps on the date their petition was filed.

3. Held, further, Ps' failure to request an Appeals Office conference did not constitute a "[refusal] * * * to participate in an Appeals office conference" within the meaning of sec. 301.7430-1(e)(2)(ii), Proced. & Admin. Regs., and, because no 30-day letter was issued to Ps prior to the mailing of their notice of deficiency, Ps are deemed to have per se exhausted their administrative remedies for purposes of sec. 7430(b)(1).

4. Held, further, Ps have not unreasonably protracted the proceedings within the meaning of sec. 7430(b)(4).

5. Held, further, the amount sought by Ps for litigation costs in this matter is not reasonable and must be adjusted to comport with the record.


Neal J. Block and Maura Ann McBreen, for petitioners.

Gregory J. Stull, for respondent.


OPINION

DAWSON, Judge:  This case was assigned to Special Trial Judge John F. Dean pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183.[1]  The Court agrees with and adopts the Special Trial Judge's opinion, which is set forth below.

---

[1]    Unless otherwise indicated, all section references are to the Internal Revenue Code.  All Rule references are to the Tax Court Rules of Practice and Procedure.

OPINION OF THE SPECIAL TRIAL JUDGE

DEAN, Special Trial Judge:  This matter is before the Court pursuant to petitioners' motion for award of reasonable litigation costs under section 7430 and Rule 231.

References to petitioner are to James H. Swanson.

The matter before us involves petitioners' combined use of a domestic international sales corporation, a foreign sales corporation, and two separate individual retirement accounts as a means of deferring the recognition of income.  Respondent zealously strove to characterize this arrangement, as well as an unrelated sale by petitioners of their Illinois residence, as tax avoidance schemes.  A protracted period of entrenchment ensued, during which the parties firmly established their respective positions, neither side wavering from its conviction that it was in the right.  Ultimately, however, these issues were resolved by respondent's notice of no objection to petitioners' motion for partial summary judgment as well as the entry of an agreed decision document, which was later set aside and filed as a stipulation of settlement.  As a consequence, petitioners now seek redress for what they claim were unreasonable positions taken by respondent.

A. Factual Background

Petitioners resided in Florida at the time the petition was filed. At all times relevant to the following discussion, petitioner was the sole shareholder of H & S Swansons' Tool Company (hereinafter, Swansons' Tool), which has operated as a Florida corporation since 1983.[2] Swansons' Tool elected to be taxed as a subchapter S corporation effective in 1987.

Swansons' Tool is in the business of building and painting component parts for various equipment manufacturers. As a part of these activities, Swansons' Tool manufactures and exports property for use outside the United States.

1. The DISC and IRA #1

Following the advice of experienced counsel, petitioner arranged in the early part of January 1985 for the organization of Swansons' Worldwide, Inc., a domestic international sales corporation (hereinafter the DISC or Worldwide). During this period, petitioner also arranged for the formation of an individual retirement account (hereinafter IRA #1).

The articles of incorporation for Worldwide were filed on January 9, 1985, and under the terms thereof petitioner was named the corporation's initial director. Shortly thereafter,

---

[2] Initially organized as a corporation in the State of Illinois, Swansons' Tool was subsequently merged into a newly formed Florida corporation of the same name on Dec. 30, 1983.

Worldwide filed a Form 4876A, Election to be Treated as an Interest Charge DISC.

A Form 5305, Individual Retirement Trust Account, was filed on January 28, 1985, establishing Florida National Bank (hereinafter Florida National) as trustee of IRA #1, and petitioner as the grantor for whose benefit the IRA was established.  Under the terms of the IRA agreement, petitioner retained the power to direct IRA #1's investments.

On the same day that the Form 5305 was filed, petitioner directed Florida National to execute a subscription agreement for 2,500 shares of Worldwide original issue stock.  The shares were subsequently issued to IRA #1, which became the sole shareholder of Worldwide.

For the taxable years 1985 to 1988, Swansons' Tool paid commissions to Worldwide with respect to the sale by Swansons' Tool of export property, as defined by section 993(c).  In those same years, petitioner, who had been named president of Worldwide, directed, with Florida National's consent, that Worldwide pay dividends to IRA #1.[3]  Commissions paid to

---

[3]    The following dividends were paid by Worldwide to IRA #1 during the taxable years 1986 through 1988:

| Paid Date | Fiscal Year | Amount |
|-----------|-------------|--------|
| 4/8/86 | 12/31/86 | $244,576 |
| 2/10/87 | 12/31/87 | 126,155 |
| 12/29/87 | 12/31/87 | 100,519 |

(continued...)

Worldwide received preferential treatment,[4] and the dividends paid to IRA #1 were tax deferred pursuant to section 408. Thus, the net effect of these transactions was to defer recognition of dividend income that otherwise would have flowed through to any shareholders of the DISC.

In 1988, IRA #1 was transferred from Florida National Bank to First Florida Bank, N.A. (hereinafter First Florida), as custodian. Swansons' Tool stopped paying commissions to Worldwide after December 31, 1988, as petitioners no longer considered such payments to be advantageous from a tax planning perspective.

2. The FSC and IRA #2

In January 1989, petitioner directed First Florida to transfer $5,000 from IRA #1 to a new individual retirement custodial account (hereinafter IRA #2). Under the terms of the IRA agreement, First Florida was named custodian of IRA #2, and petitioner was named as the grantor for whose benefit the IRA was established. Under the terms of the IRA agreement, petitioner

---

[3](...continued)

| 12/30/88 | 12/31 88 | 122,352 |
|----------|----------|---------|
| Total    |          | 593,602 |

No distributions were made to petitioners from the trust during the years at issue.

[4]  Under sec. 991, except for the taxes imposed by ch. 5, a DISC is not subject to income tax.

reserved the right to serve as the "Investment Manager" of IRA #2.

Contemporaneous with the formation of IRA #2, petitioner incorporated H & S Swansons' Trading Company (hereinafter Swansons' Trading or the FSC). Petitioner directed First Florida to execute a subscription agreement for 2,500 newly issued shares of Swansons' Trading stock. The shares were subsequently issued to IRA #2, which became the corporation's sole shareholder. Swansons' Trading filed a Form 8279, Election To Be Treated as a FSC or as a Small FSC, on March 31, 1989, and paid a dividend to IRA #2 in the amount of $28,000 during the taxable year 1990.

3. The Algonquin Property

In anticipation of Swansons' Tool's transferring its operations to Florida, petitioners moved during 1981 from their Algonquin, Illinois, residence (hereinafter, the Algonquin property or the property) to a condominium in St. Petersburg, Florida. The Algonquin property was not advertised for sale until sometime during 1983.

Conscious of a change in the Internal Revenue Code which would eliminate preferential treatment of capital gain recognized on the sale of their home, petitioners sought to sell the Algonquin property prior to December 31, 1986.[5] As time was

---

[5] The Tax Reform Act of 1986 (TRA), Pub. L. 99-514, sec. 301(a), 100 Stat. 2085, 2216, eliminated the deduction under sec.

(continued...)

clearly a factor, petitioners arranged to sell the property to a trust of which Swansons' Tool was the beneficiary. Accordingly, on December 19, 1986, petitioners conveyed the Algonquin property to "Trust No. 234, Barry D. Elman, trustee," (hereinafter Trust No. 234) under a Deed in Trust, which was received and filed by the Recorder for the city of McHenry, Illinois. As a consequence of this transaction, petitioners reported a long-term capital gain of $141,120.78 on Schedule D, Capital Gains and Losses, of their 1986 Federal income tax return, reflecting a $225,000 sale price and an $83,879 basis.

Petitioners continued paying the electric bills, heating, exterior maintenance, and house sitting expenses of the Algonquin property through May or June of 1987. In March of 1988, Swansons' Tool reimbursed petitioners for maintenance and repair expenses incurred during the time period December 1986 through May 1987, as well as the expense of moving petitioners' personal belongings in September 1987. Swansons' Tool capitalized these expenditures as part of its basis in the Algonquin property. Subsequent to the signing of a "Real Estate Sales Contract" during March of 1988, the Algonquin property was sold by Swansons' Tool to an unrelated third party on June 23, 1988.

---

[5](...continued)
1202 for 60 percent of net long-term capital gains. The repeal was effective for tax years beginning after Dec. 31, 1986.

Petitioners' daughter, Jill, resided at the Algonquin residence from May of 1987 through June of 1988.  Although the record is not clear as to the extent of usage, it appears that petitioners also periodically stayed at the residence subsequent to its sale on December 19, 1986.

4. The Notice of Deficiency

Despite petitioners' agreement to extend the period of limitations in their case until June 30, 1992, petitioners did not receive a 30-day letter prior to the notice of deficiency. Petitioners agreed to the extension in the hope of resolving the case at the administrative level.

In the notice of deficiency, dated June 29, 1992, respondent set forth one primary and three alternative positions for determining deficiencies in petitioners' Federal income taxes and additions to tax for negligence with respect to petitioners' 1986, 1988, 1989, and 1990 taxable years.  Of relevance to the present matter were respondent's determinations that:  (1) "Prohibited transactions" had occurred which resulted in the termination of IRA's #1 and #2; and (2) the sale of the Algonquin property to a trust in 1986 was a "sham" transaction which could not be recognized for tax purposes.

a. "Prohibited Transactions"

Because the notice of deficiency failed to adequately explain respondent's bases for determining deficiencies

and additions to tax with respect to the years at issue,
petitioners requested and received the revenue agent's report in
their case. As demonstrated by the revenue agent's report,
respondent identified, as alternative positions, two "prohibited
transactions" which resulted in the loss of IRA #1's status as a
trust under section 408. First, respondent concluded that:

> Mr. Swanson is a disqualified person within the meaning
> of section 4975(e)(2)(A) of the Code as a fiduciary
> because he has the express authority to control the
> investments of * * * [IRA #1].

> Mr. Swanson is also an Officer and Director of
> Swansons' Worldwide. Therefore, direct or indirect
> transactions described by section 4975(c)(1) between
> Swansons' Worldwide and * * * [IRA #1] constitute
> prohibited transactions.

> Mr. Swanson, as an Officer and Director of Worldwide
> directed the payment of dividends from Worldwide to
> * * * [IRA #1] * * * * The payment of dividends is a
> prohibited transaction within the meaning of section
> 4975(c)(1)(E) of the Code as an act of self-dealing
> where a disqualified person who is a fiduciary deals
> with the assets of the plan in his own interest. The
> dividend paid to * * * [IRA #1] December 30, 1988 will
> cause the IRA to cease to be an IRA effective January
> 1, 1988 by reason of section 408(e)(1). Therefore, by
> operation of section 408(d)(1), the fair market value
> of the IRA is deemed distributed January 1, 1988.
> [Emphasis added.]

As further demonstrated by the revenue agent's report,
respondent's second basis for disqualifying IRA #1 under section
408 was that:

> In his capacity as fiduciary of * * * [IRA #1], Mr.
> Swanson directed the bank custodian, Florida National
> Bank, to purchase all of the stock of Swansons'

Worldwide.  At the time of the purchase, Mr. Swanson was the sole director of Swansons' Worldwide.

> The sale of stock by Swansons' Worldwide to Mr. Swanson's Individual Retirement Account constitutes a prohibited transaction within the meaning of section 4975(c)(1)(A) of the Code.  The sale occurred February 15, 1985.  By operation of section 408(e)(2)(A) of the Code, the Individual Retirement Account ceases to be an Individual Retirement Account effective January 1, 1985.
>
> Effective January 1, 1985 the Individual Retirement Account is not exempt from tax under section 408(e)(1) of the Code.  The fair market value of the account, including the 2500 shares of Swansons' Worldwide, is deemed to have been distributed to Mr. Swanson in accordance with section 408(e)(2)(B) of the Code. Therefore, Mr. Swanson effectively became the sole shareholder of Swansons' Worldwide, Inc. with the loss of the IRA's tax exemption.  [Emphasis added.]

Although the record is not entirely clear on the matter, it appears that respondent imputed to IRA #2 the prohibited transactions found with respect to IRA #1 and used similar reasoning to disqualify IRA #2 as a valid trust under section 408(a).

b. "Sham Transaction"

With respect to the Algonquin property, respondent concluded in the notice of deficiency that:

> the purported sale of your personal residence located in Algonquin, Illinois by you in 1986 to Trust #234, Barry D. Elman, Trustee, of which your corporation, H & S Swansons' Tool Company, Inc. is the beneficiary, can not be recognized for tax purposes.  The purported sale in 1986 was no more than a sham transaction which was entered into for tax avoidance purposes.  It is determined that the purported sale served no other

purpose than to enable you to obtain the tax benefit of
a long term capital gain deduction of 60 percent that
would not have been available had the sale occurred in
tax years subsequent to 1986.  * * * [Emphasis added.[6]]

5. The Petition, Answer, Motion for Summary Judgment, and
Settlement Agreement

In their petition, filed September 21, 1992, petitioners
stated with respect to respondent's determination of "prohibited
transactions" that:  (1) At all pertinent times IRA #1 was the
sole shareholder of Worldwide; (2) since the 2,500 shares of
Worldwide issued to IRA #1 were original issue, no sale or
exchange of the stock occurred; (3) from and after the dates of
his appointment as director and president of Worldwide,
Mr. Swanson engaged in no activities on behalf of Worldwide which
benefited him other than as a beneficiary of IRA #1; (4) IRA #1
was not maintained, sponsored, or contributed to by Worldwide
during the years at issue; (5) at no time did Worldwide have any
active employees; and (6) Mr. Swanson engaged in no activities on
behalf of Swansons' Trading which benefited him other than as a
beneficiary of IRA #2.

With respect to the Algonquin residence, petitioners stated,
in pertinent part, that:  (1) On December 19, 1986, petitioners
conveyed the Algonquin property by a Deed in Trust to a trust of

---

[6]     Respondent used substantially similar language in setting
forth one primary and two alternative positions on this issue.

which Swansons' Tool was the beneficiary; (2) the transfer documents conveyed full legal and beneficial ownership from petitioners to this trust; (3) at no time did petitioners act in any manner that was inconsistent with their transfer of all their right, title, and interest in the Algonquin property; and (4) subsequent to the sale, petitioners had no rights as tenants of the property other than as tenants at will.

Respondent filed an answer on November 13, 1992, denying, or denying for lack of knowledge, each of the allegations listed above.

Petitioners filed a motion for partial summary judgment on March 22, 1993. In their motion, petitioners restated their position, as set forth in their petition, that no prohibited transactions had occurred with respect to IRA's #1 and #2.

On July 12, 1993, respondent filed a notice of no objection to petitioners' motion for partial summary judgment, thereby ending the controversy on the DISC and FSC issues.

Respondent conceded the Algonquin property issue in a settlement agreement entered into on January 24, 1994. The parties agreed at that time to a total deficiency of $11,372.40, which reflected an amount conceded by petitioners in their petition as capital gain inadvertently omitted from their 1988 Federal income tax. A stipulated decision (hereinafter the decision) was submitted by the parties and entered on February 9, 1994.

6. Motion for Award of Reasonable Litigation Costs

On March 14, 1994, this Court received petitioner Josephine Swanson's motion for award of reasonable litigation costs (hereinafter also referred to as the motion). Finding that it was not petitioner Josephine Swanson's intent that the decision entered on February 9, 1994, be conclusive as to the issue of attorney's fees, the Court ordered on April 29, 1994, that the decision be vacated and set aside. The Court further ordered that the decision of February 9, 1994, be filed as a stipulation of settlement, that petitioner Josephine Swanson's motion for award of reasonable litigation costs be filed, and that respondent file a response to petitioner Josephine Swanson's motion in accordance with Rule 232(c).

Respondent's objection to petitioner Josephine Swanson's motion for award of reasonable litigation costs was filed on June 29, 1994. Petitioners sought leave to file a response to respondent's objection by a motion filed August 3, 1994, which was granted.

Petitioners filed an amendment to the motion for award of reasonable litigation costs (hereinafter amendment to motion) on August 1, 1994, pursuant to which petitioner James Swanson joined petitioner Josephine Swanson as a party to the motion.

Petitioners filed their response to respondent's objection to petitioners' motion for award of reasonable litigation costs on September 15, 1994.

Following a conference call with the parties on March 20, 1995, the parties were ordered to file a stipulation of facts with respect to items of net worth reported by petitioners on attachment II of their amendment to motion.  They were further ordered to file a stipulation of facts regarding the issue of attorney's fees paid or incurred by petitioners.  If the parties could not stipulate facts with respect to either issue, they were ordered to file a status report with the Court on or before May 1, 1995.

On May 1, 1995, the parties participated in a conference call, during which they agreed to stipulate certain items of net worth reported on attachment II of petitioners' amendment to motion.  The parties also agreed to stipulate that petitioners paid or incurred fees in this matter.  The parties disagreed, however, as to the proper method for determining the acquisition cost of specific items on attachment II of petitioners' amendment to motion.  With respect to these items, the parties were ordered to file, on or before June 1, 1995, simultaneous memoranda of law, and, on or before July 3, 1995, answering memoranda of law.

B. Discussion

As an initial matter, we reject respondent's argument that it was improper for us to have vacated the decision of February 9, 1994, thereby allowing petitioners to file their motion for award of reasonable litigation costs.  This Court may, in its sound discretion, set aside a decision that has not yet

become final. See, e.g., <u>Cassuto v. Commissioner</u>, 93 T.C. 256, 260 (1989), affd. in part, revd. in part, and remanded on another issue 936 F.2d 736 (2d. Cir. 1991). Having so held, we turn to the merits of petitioners' motion.

Section 7430 provides that, in any court proceeding brought by or against the United States, the "prevailing party" may be awarded reasonable litigation costs. Sec. 7430(a). To qualify as a "prevailing party" for purposes of section 7430, petitioners must establish that: (1) The position of the United States in the proceeding was not substantially justified; (2) they substantially prevailed with respect to the amount in controversy, or with respect to the most significant issue presented; and (3) they met the net worth requirements of 28 U.S.C. sec. 2412(d)(2)(B) (1994), on the date the petition was filed. Sec. 7430(c)(4)(A). Petitioners must also establish that they exhausted the administrative remedies available to them within the Internal Revenue Service and that they did not unreasonably protract the proceedings. Sec. 7430(b)(1), (4). Petitioners bear the burden of proof with respect to each of the preceding requirements. Rule 232(e).

Although it is conceded that petitioners substantially prevailed in this case, respondent does not agree that her litigation position was not substantially justified.[7]

_____

[7] Respondent argues that our consideration of whether she was
(continued...)

Furthermore, respondent asserts that petitioners:  (1) Have not satisfied the net worth requirements, (2) failed to exhaust the administrative remedies available to them within the Internal Revenue Service, (3) unreasonably protracted the proceedings, and (4) have not shown that the costs they have claimed are reasonable.  We will address each contested point in turn.

1. Whether Respondent's Litigation Position Was Substantially Justified

In 1986, Congress amended section 7430 to conform that provision more closely to the Equal Access to Justice Act (EAJA).  Tax Reform Act of 1986, Pub. L. 99-514, sec. 1551, 100 Stat. 2085, 2752.  Where the prior statute required taxpayers to prove that the Government's position in a proceeding was "unreasonable," the statute as amended now requires a showing that the position of the United States was "not substantially justified."  Sec. 7430(c)(4)(A)(i).  This Court has concluded that the substantially justified standard is essentially a continuation of the prior law's reasonableness standard.  Sher v.

[7](...continued)
substantially justified in this matter should be based, in part, on the outcome of a related case involving IRA #1.  In docket No. 21109-92, respondent determined, and IRA #1 ultimately conceded, that IRA #1 had unrelated business income for the taxable year 1988.  IRA #1's concession in docket No. 21109-92, however, appears to have been a direct result of respondent's filing her notice of no objection to petitioners' motion for summary judgment in this case.  In any event, we give no weight to the outcome of docket No. 21109-92 because it resulted from an agreement between the parties to that docket rather than a judicial determination.

Commissioner, 89 T.C. 79, 84 (1987), affd. 861 F.2d 131 (5th Cir. 1988).  Thus, a position that is "substantially justified" is one that is "justified to a degree that could satisfy a reasonable person" or that has a "reasonable basis both in law and fact." Pierce v. Underwood, 487 U.S. 552, 565 (1988) (internal quote marks omitted) (defining "substantially justified" in the context of the EAJA).

Petitioners have not sought an award of administrative costs in this matter.  Accordingly, we need only examine the question of whether respondent's litigation position was substantially justified.[8]

Respondent argues that we may not consider positions she took prior to the filing of the answer in determining whether her litigation position was substantially justified.  In support, respondent cites, among other cases,[9] Huffman v. Commissioner, 978 F.2d 1139 (9th Cir. 1992), affg. in part and revg. in part T.C. Memo. 1991-144.

---

[8]   Respondent's litigation position for purposes of this matter is that taken on Nov. 13, 1992, the date the answer was filed. See Han v. Commissioner, T.C. Memo. 1993-386.

[9]   To the extent respondent has cited for support cases which discuss sec. 7430 prior to its amendment in 1986 by TRA sec. 1551, 100 Stat. 2085, 2752, and in 1988 by the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, sec. 6239, 102 Stat. 3342, 3743, we find them to be inapposite.  See Sansom v. United States, 703 F. Supp. 1505 (N.D. Fla. 1988).

Respondent is correct in stating that <u>Huffman</u> approves of a bifurcated analysis under section 7430, pursuant to which the two stages of a case, the administrative proceeding and the court proceeding, are considered separately.  This bifurcated analysis:

> not only ensures that the prevailing taxpayer is
> reimbursed for pre-litigation and litigation costs, but
> also supports Congress's intent that before an award of
> attorney's fees is made, the taxpayer must meet the
> burden of proving that the Government's position was
> not substantially justified.  It affords another
> opportunity for the United States to reconsider an
> inappropriate position.  [<u>Id.</u> at 1146.]

Respondent's arguments on this point appear moot, however, as we find no discernible difference between the administrative and litigation positions she took in this matter.[10]  See <u>Lennox v. Commissioner</u>, 998 F.2d 244, 247-249 (5th Cir. 1993) (holding that the Government's position must be analyzed in the context of the circumstances that caused it to take that position), revg. in part and remanding T.C. Memo. 1992-382.

a. <u>The DISC Issue</u>

Petitioners contend that respondent was not substantially justified in maintaining throughout the proceedings that prohibited transactions had occurred with respect to IRA #1, and by implication, IRA #2.  We agree.

---

[10]   Respondent's administrative position for purposes of this matter is that taken on June 29, 1992, the date of the notice of deficiency.  Sec. 7430(c)(2).

As stated previously, respondent based her determination of prohibited transactions on section 4975(c)(1)(A) and (E). Section 4975(c)(1)(A) defines a prohibited transaction as including any "sale or exchange, or leasing, of any property between a plan[11] and a disqualified person".[12]  Section

_____

[11]   A "plan" is defined by sec. 4975(e)(1) to encompass an individual retirement account as described under sec. 408.

[12]   As applicable to the following discussion, sec. 4975(e)(2) defines a disqualified person as:

    (A) a <u>fiduciary</u>;

    *   *   *   *   *   *   *

    (C) an <u>employer</u> any of whose employees are covered by the plan;

    (D) an <u>employee organization</u>, any of whose members are covered by the plan;

    *   *   *   *   *   *   *

    (G) a <u>corporation</u>, partnership, <u>or trust</u> or estate of which (or in which) <u>50 percent or more of</u>--

    (i) <u>the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of such corporation</u>,

    (ii) the capital interest or profits interest of such partnership, or

    (iii) <u>the beneficial interest of such trust</u> or estate, <u>is owned directly or indirectly, or held by persons described in subparagraph (A), (B), (C), (D), or (E)</u>;

    *   *   *   *   *   *   *

    (H) <u>an officer, director (or an individual having</u>

(continued...)

4975(c)(1)(E) further defines a prohibited transaction as including any "act by a disqualified person who is a fiduciary[13] whereby he deals with the income or assets of a plan in his own interest or for his own account".

We find that it was unreasonable for respondent to maintain that a prohibited transaction occurred when Worldwide's stock was acquired by IRA #1. The stock acquired in that transaction was newly issued--prior to that point in time, Worldwide had no shares or shareholders. A corporation without shares or

---

[12](...continued)
powers or responsibilities similar to those of officers or directors), a 10 percent or more shareholder, or a highly compensated employee (earning 10 percent or more of the yearly wages of an employer) of a person described in subparagraph (C), (D), (E), or (G) * * * [Emphasis added.]

[13] In pertinent part, a "fiduciary" is defined by sec. 4975(e)(3) as any person who:

(A) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, [or]

* * * * * * *

(C) has any discretionary authority or discretionary responsibility in the administration of such plan.

At all relevant times, petitioner maintained and exercised the right to direct IRA #1's investments. Petitioner, therefore, was clearly a "fiduciary" with respect to IRA #1 and thereby a "disqualified person" as defined under sec. 4975(e)(2)(A). Furthermore, as petitioner was the sole individual for whose benefit IRA #1 was established, IRA #1 itself was a disqualified person pursuant to sec. 4975(e)(2)(G)(iii).

shareholders does not fit within the definition of a disqualified person under section 4975(e)(2)(G).[14] It was only <u>after</u> Worldwide issued its stock to IRA #1 that petitioner held a beneficial interest in Worldwide's stock, thereby causing Worldwide to become a disqualified person under section 4975(e)(2)(G).[15] Accordingly, the issuance of stock to IRA #1

---

[14] Furthermore, we find that at the time of the stock issuance, Worldwide was not, within the meaning of sec. 4975(e)(2)(C), an "employer", any of whose employees were beneficiaries of IRA #1. Although sec. 4975 does not define the term "employer", we find guidance in sec. 3(5) of the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93-406, 88 Stat. 829, 834. In pertinent part, ERISA sec. 3(5) provides that, for plans such as an IRA, an "'employer' means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan * * *." Because Worldwide did not maintain, sponsor, or directly contribute to IRA #1, we find that Worldwide was not acting as an "employer" in relation to an employee plan, and was not, therefore, a disqualified person under sec. 4975(e)(2)(C). As there is no evidence that Worldwide was an "employee organization", any of whose members were participants in IRA #1, we also find that Worldwide was not a disqualified person under sec. 4975(e)(2)(D).

[15] Sec. 4975(e)(4) incorporates the constructive ownership rule of sec. 267(c)(1), which states that:

> Stock owned, directly or indirectly, by or for a corporation, partnership, estate, or trust shall be considered as being owned proportionately by or for its shareholders, partners, or beneficiaries * * *

Petitioner, as the sole individual for whose benefit IRA #1 was established, was therefore beneficial owner of all the outstanding shares of Worldwide after they were issued. Because petitioner, as the sole beneficial shareholder of Worldwide, was also a "fiduciary" with respect to IRA #1, Worldwide thus met the definition of a disqualified person under sec. 4975(e)(2)(G).

Contrary to respondent's representations, petitioner was not a "disqualified person" as president and director of Worldwide until <u>after</u> the stock was issued to IRA #1. Sec. 4975(e)(2)(H). Furthermore, petitioner was not a disqualified person under sec.

(continued...)

did not, within the plain meaning of section 4975(c)(1)(A), qualify as a "sale or exchange, or leasing, of any property between a plan and a disqualified person".[16]  Therefore, respondent's litigation position with respect to this issue was unreasonable as a matter of both law and fact.

We also find that respondent was not substantially justified in maintaining that the payments of dividends by Worldwide to IRA #1 qualified as prohibited transactions under section 4975(c)(1)(E).  There is no support in that section for respondent's contention that such payments constituted acts of self-dealing, whereby petitioner, a "fiduciary", was dealing with

---

[15](...continued)
4975(e)(2)(H) solely due to his "shareholding" in Worldwide as the constructive attribution rules provided under sec. 267 are applicable only to sec. 4975(e)(2)(E)(i) and (G)(i).  Sec. 4975(e)(4).

[16]    Ordinarily, controlling effect will be given to the plain language of a statute unless to do so would produce absurd or futile results.  Rath v. Commissioner, 101 T.C. 196, 200 (1993) (citing United States v. American Trucking Associations, 310 U.S. 534, 543-544 (1940)).  As the Supreme Court has stated:

> in the absence of a clearly expressed legislative intention to the contrary, the language of the statute itself must ordinarily be regarded as conclusive. Unless exceptional circumstances dictate otherwise, when we find the terms of a statute unambiguous, judicial inquiry is complete. [Burlington No. R. v. Oklahoma Tax Commn., 481 U.S. 454, 461 (1987); citations and internal quotation marks omitted.]

Accordingly, when, as here, a statute is clear on its face, we require unequivocal evidence of a contrary purpose before construing it in a manner that overrides the plain meaning of the statutory words.  Rath v. Commissioner, supra at 200-201 (citing Halpern v. Commissioner, 96 T.C. 895, 899 (1991); Huntsberry v. Commissioner, 83 T.C. 742, 747-748 (1984)).

the assets of IRA #1 in his own interest.  Section 4975(c)(1)(E) addresses itself only to acts of disqualified persons who, as fiduciaries, deal directly or indirectly with the income or assets of a plan for their own benefit or account.  Here, there was no such direct or indirect dealing with the income or assets of a plan, as the dividends paid by Worldwide did not become income of IRA #1 until unqualifiedly made subject to the demand of IRA #1.  Sec. 1.301-1(b), Income Tax Regs.  Furthermore, respondent has never suggested that petitioner, acting as a "fiduciary" or otherwise, ever dealt with the corpus of IRA #1 for his own benefit.

Based on the record, the only direct or indirect benefit that petitioner realized from the payments of dividends by Worldwide related solely to his status as a participant of IRA #1.  In this regard, petitioner benefited only insofar as IRA #1 accumulated assets for future distribution.  Section 4975(d)(9) states that section 4975(c) shall not apply to:

> receipt by a disqualified person of any benefit to which he may be entitled as a participant or beneficiary in the plan, so long as the benefit is computed and paid on a basis which is consistent with the terms of the plan as applied to all other participants and beneficiaries.

Thus, we find that under the plain meaning[17] of section 4975(c)(1)(E), respondent was not substantially justified in

---

[17]    See the discussion supra note 16 regarding application of a statute's plain meaning.

maintaining that the payments of dividends to IRA #1 constituted prohibited transactions. Respondent's litigation position with respect to this issue was unreasonable as a matter of both law and fact.[18]

Respondent would have us believe that the delay in settling the DISC issue was due to a statement in petitioners' motion for partial summary judgment that IRA #1 was exempt from tax at all times. In her memorandum in objection to petitioners' motion for litigation costs, respondent contends that this was a "new and overriding issue" that required her to determine whether "any other" prohibited transactions had occurred during the period covered by the notice of deficiency. We disagree.

We need look no further than respondent's own memorandum to divine that the true reason for her delay in conceding the DISC

---

[18]    In a letter accompanying the revenue agent's report, respondent stated that:

> We believe the statutory Notice of Deficiency adequately describes the adjustments asserted therein. Moreover, during the course of the examination your client became fully cognizant of the transactions under scrutiny. However, as a convenience to you, enclosed is a copy of the revenue agent's report. Naturally, it is not the Service's intent by this letter to in any way limit the general language of the statutory notice. The Commissioner will stand on any ground fairly raised by the statutory notice as a basis for her determination.

In finding that respondent was not substantially justified with respect to the DISC issue, we have considered all grounds upon which respondent could fairly raise a question of prohibited transactions under sec. 4975.

issue was her desire to discover new facts with which to
resuscitate her meritless litigation position.  The following
statements from respondent's memorandum are illuminating in this
regard:

> due to the complexity of the prohibited transaction
> rules and the many ways in which disqualified person
> status can be achieved through specific relationships
> described in I.R.C. § 4975(e)(2), it was imperative
> that respondent explore other possible violations
> before conceding that the facts (as represented by
> petitioner's counsel) demonstrated no violation.

> *     *     *     *     *     *     *

> Petitioner husband established the IRA and created
> a DISC inside of his IRA to shelter from current income
> inclusion dividend payments made by an international
> trading company in which he was the sole shareholder.
> But for the existence of the IRA, such dividends would
> be currently taxable to him.  If he had created the
> DISC outside of the IRA, and then sold some or all of
> the stock in the DISC to the IRA, the sale of stock in
> the DISC to his IRA would clearly violate the
> prohibited transactions rules under I.R.C. § 4975.
> Similarly, the payment of any dividends from his wholly
> owned corporation to his IRA that effectively allows
> him to avoid current income inclusion because he
> assigned his interest in the DISC to his IRA arguably
> represents an indirect benefit to him personally.

> For example, both petitioner husband and
> petitioner wife indirectly received a significant
> current tax benefit derived from the payment of DISC
> dividends into his IRA, rather than to the husband as a
> direct shareholder.  But for the creation and
> maintenance of the IRA, petitioner husband (and, by
> virtue of her election to file a joint return, the
> petitioner wife) would have current income inclusion
> for payments from the trading corporation to the DISC.
> Accordingly, the transactions between his wholly-owned
> trading corporation to such entity are arguably
> indirect prohibited transactions between disqualified
> persons and the IRA.  Also, since one slight variation
> in the structure or operation of the petitioner's
> transactions could have resulted in noncompliance with

> the prohibited transactions rules, it was clearly reasonable for respondent not to concede her position on answer and to analyze thoroughly all positions presented by petitioner's counsel during the litigation stage of the case. [Emphasis added.]

We read the preceding statements as an acknowledgment by respondent that her litigation position, as developed in the administrative proceedings and adopted in her answer, was without a foundation in fact or law. This case is distinguishable from those in which respondent promptly conceded an unreasonable position taken in her answer, thereby avoiding an award of litigation costs. Nothing occurred between the filing of respondent's answer and her notice of no objection to alter the fact that she had misapplied the prohibited transaction rules of section 4975 to petitioners' case. Accordingly, we find that respondent's litigation position with respect to IRA #1 was not substantially justified. Petitioners are therefore entitled to an award of litigation costs under section 7430.

As respondent's determination of deficiencies with respect to IRA #2 was inexorably linked to the fate of IRA #1, the award of litigation costs is also intended to cover respondent's litigation position with respect to IRA #2.[19]

b. The House Issue

Petitioners contend that respondent was not substantially justified in determining that the sale of the Algonquin property

---

[19] See discussion of IRA #2 supra p. 11.

to Trust No. 234 was a sham transaction.  Respondent, on the other hand, argues that such a determination was reasonable, particularly in light of the postsale use by petitioners and their daughter.

A "sham" transaction is one which, though it may be proper in form, lacks economic substance beyond the creation of tax benefits.  Karr v. Commissioner, 924 F.2d 1018, 1022-1023 (11th Cir. 1991), affg. Smith v. Commissioner, 91 T.C. 733 (1988).  In the context of a sale transaction, as here, the inquiry is whether the parties have in fact done what the form of their agreement purports to do.  Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981).

The term "sale" is given its ordinary meaning for Federal income tax purposes and is generally defined as a transfer of property for money or a promise to pay money.  Commissioner v. Brown, 380 U.S. 563, 570-571 (1965).  In deciding whether a particular transaction constitutes a sale, the question of whether the benefits and burdens of ownership have passed from seller to buyer must be answered.  This is a question of fact which is to be ascertained from the intention of the parties, as evidenced by the written agreements read in light of the attendant facts and circumstances.  Haggard v. Commissioner, 24 T.C. 1124, 1129 (1955), affd. 241 F.2d 288 (9th Cir. 1956).

Various factors to consider in making a determination as to whether a sale has occurred were summarized in Grodt & McKay Realty, Inc. v. Commissioner, supra at 1237-1238, as follows:

(1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether equity was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property. * * * [Citations omitted.]

An additional factor to be weighed is the presence or absence of arm's-length dealing. Falsetti v. Commissioner, 85 T.C. 332, 348 (1985) (citing Estate of Franklin v. Commissioner, 64 T.C. 752 (1975), affd. 544 F.2d 1045 (9th Cir. 1976)).

We recognize that a number of the factors listed above favor petitioners' contention that the sale of the Algonquin property was not a "sham" transaction. Nevertheless, the fact remains that petitioners continued paying the heating, electricity, security, and maintenance expenses incurred for the property until sometime in June 1987; i.e., over 5 months after their sale of the property to Trust No. 234. Petitioners also paid for a number of repairs to the property prior to its sale to a third party in 1988. Although petitioners were ultimately reimbursed for all or part of these expenses, it appears that such reimbursement did not occur until proximate to the time a contract of sale was signed between Trust No. 234 and the third

party. Finally, we cannot discount the fact that petitioners and their daughter occupied the property at various times between the time of its sale to the trust and its ultimate sale to a third party. In the case of the daughter, this period of occupancy lasted just over 1 year and ended shortly before the property was sold to the third party in June of 1988. The foregoing takes on added significance in light of the fact that petitioner was on "both sides" of the initial sale--both as owner of the property and as the sole shareholder of Swansons' Tool. Combined with the questionable business purpose behind a manufacturing corporation's purchase of a personal residence, we do not find it unreasonable that respondent would challenge the sale as not being at arm's-length.

Based on the record as a whole, we cannot say that respondent's position with respect to the house issue was unreasonable, as a matter of either law or fact. We recognize that petitioners have cited a number of cases supporting the proposition that sales to close corporations by shareholders are not "sham" transactions per se. We further note that petitioners cited cases supporting the permissible occupancy of a residence subsequent to its sale. A careful reading of each, however, does not persuade us that, based on the facts of this case, respondent's litigation position was not substantially justified.

Accordingly, we find that petitioners have failed to meet their burden of proof on this issue.[20]

Our conclusion is not diminished by the fact that respondent ultimately conceded this matter in petitioners' favor prior to trial.  The determination of whether respondent's position was substantially justified is based on all the facts and circumstances surrounding a proceeding; the fact that respondent ultimately concedes or loses a case is not determinative.  See Wasie v. Commissioner, 86 T.C. 962, 968-969 (1986); DeVenney v. Commissioner, 85 T.C. 927, 930 (1985).

2.  Net Worth

Respondent contends that petitioners have failed to demonstrate that they satisfied the net worth requirement of section 7430(c)(4)(A)(iii).

To qualify as a prevailing party eligible for an award of litigation costs, a taxpayer must establish that he or she has a net worth that did not exceed $2 million "at the time the civil action was filed".[21]  In the case of a husband and wife seeking

---

[20]  For similar reasons, we find that it was not unreasonable as a matter of fact or law for respondent to contend in alternative positions that the proceeds from the sale of the Algonquin property should be adjusted between petitioners and Swansons' Tool.  Having carefully considered petitioners' arguments, we find that they have not met their burden of proving that respondent was not substantially justified on this point.

[21]  This requirement is set forth by implication in sec. 7430(c)(4), which states in pertinent part that:

        (A) In general.--The term "prevailing party" means
    any party in any proceeding to which subsection (a)
                                        (continued...)

an award of litigation costs, the net worth test is applied to each separately.  Hong v. Commissioner, 100 T.C. 88, 91 (1993).

Although the term "net worth" is not statutorily defined, the legislative history to the EAJA states:  "In determining the value of assets, the cost of acquisition rather than fair market value should be used."  H. Rept. 96-1418, at 15 (1980); see also United States v. 88.88 Acres of Land, 907 F.2d 106, 107 (9th Cir. 1990); American Pacific Concrete Pipe Co., Inc. v. NLRB, 788 F.2d 586, 590 (9th Cir. 1986); Continental Web Press, Inc. v. NLRB, 767 F.2d 321, 322-323 (7th Cir. 1985).

To demonstrate that they each had a net worth of less than $2,000,000 on the date their petition was filed, petitioners submitted, on August 1, 1994, a "STATEMENT OF NET WORTH AT ACQUISITION COST AS OF SEPTEMBER 21, 1992".[22]  Petitioners' separate net worths were reported on this statement as follows:

---

[21](...continued)
     applies

                    *    *    *    *    *    *    *

          (iii) which meets the requirements of
     * * * section 2412(d)(2)(B) of title 28,
     United States Code (as in effect on October
     22, 1986) * * *.

As applicable to this case, 28 U.S.C. sec. 2412(d)(2)(B) provides that a "party" means "an individual whose net worth did not exceed $2,000,000 at the time the civil action was filed."

[22]   This statement of net worth was submitted as "attachment II" to petitioners' amendment to motion for award of reasonable litigation costs.  As noted by petitioners, the figures presented therein are unadjusted for depreciation.

| Asset | Acq. Cost | James | Josephine |
|---|---|---|---|
| Cash/Checking | $48,375 | $24,188 | $24,188 |
| Money Fund | 188,657 | 188,657 | - |
| Repo Account | 184,155 | 184,155 | - |
| Mortgage | 76,225 | 38,113 | 38,113 |
| Mortgage | 40,000 | 40,000 | - |
| Contract | 34,433 | 34,433 | - |
| Note-1 | 26,815 | 26,815 | - |
| Note-2 | 2,300 | 2,300 | - |
| Note-3 | 80,000 | 80,000 | - |
| Note-4 | 17,500 | 17,500 | - |
| IRA-Kemper | 9,000 | 9,000 | - |
| IRA-Kemper | 8,250 | - | 8,250 |
| IRA-1st Fla. | 2,500 | 2,500 | - |
| IRA-1st Fla. | 5,000 | 5,000 | - |
| 401-K Plan | 45,000 | 45,000 | - |
| Condo | 185,000 | - | 185,000 |
| Industrial Bldg. | 107,500 | - | 107,500 |
| Industrial Bldg. | 260,000 | - | 260,000 |
| Industrial Vacant | 65,000 | 65,000 | - |
| Stock - HSSTC | 59,200 | 59,200 | - |
| Prestige | 23,500 | - | 23,500 |
| Breck | 25,000 | 25,000 | - |
| West Coast | 25,000 | 25,000 | - |
| Sunshine | 20,910 | 20,910 | - |
| FSCC | 5,000 | 5,000 | - |
| Sailboat | 85,000 | 85,000 | - |
| Motorboat | 8,000 | 8,000 | - |
| Auto | 17,000 | | 20,000 [sic] |
| Art, etc. | 40,000 | 20,000 | 20,000 |
| Totals | 1,694,322 [sic] | 1,010,771 | 683,551 |

With an exception for the four IRA's, the 401(k) plan, and the stock of the six listed corporations, the parties stipulated on May 16, 1995, to the accuracy of the preceding statement.[23]

---

[23] We note that petitioners omitted the asset identified as "Florida Bonds" from their Aug. 1, 1994, statement of net worth in the amount of $60,000 to be allocated half to each petitioner. Petitioners have explained, and we accept, that this was an

(continued...)

Pursuant to our Order of May 1, 1995, the parties submitted simultaneous and answering memoranda of law, addressing the proper method for determining the acquisition cost of those assets for which there had been no stipulation. As set forth in these memoranda, petitioners argue for an approach whereby the amount paid for an asset, adjusted for depreciation, establishes the acquisition cost of an asset for purposes of the net worth computation. Respondent, on the other hand, argues that the acquisition cost of an asset should constantly be adjusted to reflect realized (if not recognized) income. To quote respondent:

> In summary, acquisition costs of an asset are generated not only from external contributions but also from realized gains, the internal reinvestment of which acquires an increase, improvement, or enhancement in such asset.

Having carefully considered the parties' respective arguments, we accept petitioners' computation of their net worth under section 7430(c)(4)(A)(iii). We find no basis in this case for disregarding the separate legal status of entities in which petitioners hold beneficial or legal interests. See, e.g., Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 438-439 (1943); Webb v. United States, 15 F.3d 203, 207 (1st Cir. 1994);

---

[23](...continued)
accidental omission. The stipulation of facts contains other nonmaterial modifications and corrections.

<u>Bertoli v. Commissioner</u>, 103 T.C. 501, 511-512 (1994); <u>Allen v. Commissioner</u>, T.C. Memo. 1988-166.

Respondent argues that even if Congress originally intended acquisition cost as the proper measure of net worth, relatively recent trends in generally accepted accounting principles (GAAP) require that such a measure be abandoned. We have considered respondent's arguments on this point and find them off the mark. While there has been a change in the rules regarding the method by which individuals prepare their financial statements, there has been no change in the definition of acquisition cost under GAAP, and as that was the standard set forth in the legislative history, it is the measure of net worth we apply to this case.[24]

After careful review of the record, we find that petitioners have adequately set forth a statement of their net worth pursuant to Rule 231(b)(5) and have met the burden of proving that their separate net worths did not exceed $2 million on the date they filed their petition.

We have considered all other arguments raised by respondent regarding the net worth requirement and, to the extent not

_____

[24] As noted by the Courts of Appeals for the Ninth and Seventh Circuits, "the cost of acquisition" under GAAP is arrived at by subtracting accumulated depreciation from the original cost of an asset. <u>American Pacific Concrete Pipe Co., Inc. v. NLRB</u>, 788 F.2d 586, 590-591 (9th Cir. 1986); <u>Continental Web Press, Inc. v. NLRB</u>, 767 F.2d 321, 322-323 (7th Cir. 1985). We do not here decide whether depreciation should be used in determining net worth for purposes of sec. 7430(c)(4)(A), as petitioners' separate net worths, whether computed using depreciation or not, do not exceed $2 million.

discussed above, find them to be without merit.  Before continuing, however, we find it necessary to comment on some of the arguments raised by respondent in her memoranda.

While there was colorable merit to some of the contentions raised by respondent in her memoranda regarding the question of net worth, others border on being frivolous and vexatious.  As an illustration, respondent set forth the following proposition in arguing that additional amounts should be added to petitioner Josephine Swanson's calculation of net worth:

> Florida provides for the equitable distribution of property between spouses upon divorce.  Fla. Stat. ch. 61.075 (1994). * * *
>
> Respondent notes that the record provides no indication of marital disharmony between the petitioners and presumes that Florida's equitable distribution statute does not expressly apply to this case.  However, this significant expectancy to receive an equitable distribution in the event of divorce may itself constitute an asset of a spouse entitled to recognition for purposes of the net worth computation.

Such transparent sophistry speaks for itself and comes perilously close to meriting an award of fees to petitioners under section 6673(a)(2).

3. <u>Exhaustion of Administrative Remedies</u>

Notwithstanding our conclusion that respondent was not substantially justified with respect to the DISC issue, petitioners are not entitled to an award of litigation costs if it is found that they failed to exhaust their administrative remedies.

No "30-day letter" was issued to petitioners prior to the issuance of the statutory notice of deficiency.  Respondent contends, however, that petitioners failed to exhaust their administrative remedies by not seeking an Appeals Office conference prior to the filing of their motion for summary judgment.  In support, respondent maintains that:

> After commencing litigation, * * * [petitioners'] attorneys forged quickly ahead by filing a motion for partial summary judgment without attempting to confer with either Appeals or District Counsel to seek a possible settlement--a conference which likely would have eliminated the need for the parties to prepare a prosecution and defense of the motion and its extensive exhibits and attachments, perhaps resulting in reduced litigation activities, saving time for the parties and the Court.

In opposition, petitioners state that, pursuant to section 301.7430-1(e)(2), Proced. & Admin. Regs., they have per se exhausted their administrative remedies.

In pertinent part, section 301.7430-1(e), Proced. & Admin. Regs., sets forth the following exception to the general rule that a party must participate[25] in an Appeals Office conference in order to exhaust its administrative remedies:

---

[25]    Sec. 301.7430-1(b)(2), Proced. & Admin. Regs., provides that:

> a party or qualified representative of the party * * * participates in an Appeals office conference if the party or qualified representative discloses to the Appeals office all relevant information regarding the party's tax matter to the extent such information and its relevance were known or should have been known to the party or qualified representative at the time of such conference.

(e) Exception to requirement that party pursue administrative remedies.  If the conditions set forth in paragraphs (e)(1), (e)(2), (e)(3), or (e)(4) of this section are satisfied, a party's administrative remedies within the Internal Revenue Service shall be deemed to have been exhausted for purposes of section 7430.

\*      \*      \*      \*      \*      \*      \*

(2)  In the case of a petition in the Tax Court--

(i)  The party did not receive a notice of proposed deficiency (30-day letter) prior to the issuance of the statutory notice and the failure to receive such notice was not due to actions of the party (such as failure to supply requested information or a current mailing address to the district director or service center having jurisdiction over the tax matter); and

(ii)  The party does not refuse to participate in an Appeals office conference while the case is in docketed status. [Emphasis added.]

Section 301.7430-1, Proced. & Admin. Regs., fails to define the phrase "does not refuse to participate".

Respondent's arguments suggest that section 301.7430-1(e)(2), Proced. & Admin. Regs., is to be interpreted as requiring an affirmative act by petitioners; i.e., a request for an Appeals Office conference.  Petitioners, on the other hand, contend that the proper interpretation is one that puts the burden on respondent, requiring that she act affirmatively. Petitioners reason that they cannot "refuse to participate" in an

Appeals Office conference unless and until respondent makes <u>an offer</u> of such a conference.[26]

We conclude that petitioners' reading of section 301.7430-1(e)(2), Proced. & Admin. Regs., is correct.  Section 601.106(d)(3), Statement of Procedural Rules, states that with respect to cases docketed in the Tax Court:

> (iii) If the deficiency notice in a case docketed in the Tax Court was not issued by the Appeals office and no recommendation for criminal prosecution is pending, the case <u>will</u> be referred by the district counsel to the Appeals office for settlement as soon as it is at issue in the Tax Court.  The settlement procedure <u>shall</u> be governed by the following rules:

> (a)  The Appeals office will have exclusive settlement jurisdiction for a period of 4 months over certain cases docketed in the Tax Court.  The 4 month period will commence at the time Appeals receives the case from Counsel, which will be after the case is at issue.  <u>Appeals will arrange settlement conferences in such cases within 45 days of receipt of the case</u>. * * * [Emphasis added.]

The notice of deficiency in this matter was issued by the District Director for Jacksonville, Florida.  There is no suggestion that a recommendation for criminal prosecution was ever pending against petitioners.  Accordingly, pursuant to the procedural rules, respondent's Appeals Office gained settlement jurisdiction over petitioners' case after it was docketed in this Court and maintained such jurisdiction for a period of

---

[26]    As we have not found any prior cases addressing this issue, it appears that the correct interpretation of the meaning of the regulation is one of first impression.

4 months. Contrary to the language of section 601.106(d)(3)(iii)(a), Statement of Procedural Rules, however, Appeals in this case did not arrange a settlement conference within 45 days of receipt of petitioners' case. Petitioners could not, therefore, have refused to participate in an Appeals Office conference, as none was ever offered.

We note that when a 30-day letter has been issued, the procedural rules provide that, in general, the taxpayer is entitled, as a matter of right, to an Appeals Office conference. See sec. 601.106(b), Statement of Procedural Rules. No such right exists, however, once the taxpayer's case is docketed in the Tax Court. Furthermore, once the case is docketed, there is no provision in the procedural rules for a taxpayer request for an Appeals Office conference.

Based on the foregoing, we find that petitioners have exhausted their administrative remedies within the meaning of section 7430 and the regulations thereunder.

4. Whether Petitioners Unreasonably Protracted the Proceedings

Based upon the record, we find that petitioners did not protract the proceedings.

5. Whether the Fees Sought in This Matter Are Reasonable

As discussed below, we find that the amount sought by petitioners in this matter for litigation costs is not reasonable and must be adjusted to comport with the record.

C. Award of Litigation Costs

As an initial matter, we note that the parties disagree as to whether the cost of living adjustment (COLA), which applies to an award of attorney's fees under section 7430, should be computed from October 1, 1981, or from January 1, 1986.[27] Respectively, these are the two dates on which COLA's were first provided under the EAJA and section 7430.

Our position on this issue was addressed in Bayer v. Commissioner, 98 T.C. 19 (1992), where we concluded that Congress, in providing for cost of living adjustments in section 7430, intended the computation to start on the same date the COLA's were started under the EAJA; i.e., October 1, 1981. Id. at 23. Citing Lawrence v. Commissioner, 27 T.C. 713 (1957), revd. on other grounds 258 F.2d 562 (9th Cir. 1958), we stated that we would continue to use 1981 as the correct year for making the COLA calculation, unless, of course, the Court of Appeals to which appeal lay had held otherwise. Golsen v. Commissioner, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

This case is appealable to the Court of Appeals for the 11th Circuit, which has not addressed the question of whether 1981 or 1986 is the correct date for purposes of computing the COLA

---

[27] Petitioners are seeking an award of fees based solely upon the statutorily provided rate of $75 an hour, as adjusted by the COLA. Sec. 7430(c)(1)(B)(iii). Petitioners have not argued that there are "special factors" which would justify a higher rate in this case. Id.

adjustment under section 7430. Accordingly, we will follow our holding in Bayer, and we find October 1, 1981, to be the applicable date from which to make the adjustment.

### 1. Amount of Litigation Costs

Petitioners seek an award of litigation fees and expenses in the total amount of $140,580.46. Petitioners have also asked that they be awarded any additional costs incurred since March 1, 1994, to recover such fees and expenses. However, as explained in the affidavit of petitioners' counsel filed as a supplement to motion for litigation costs:

> with counsel's acquiescence, Petitioners have paid to date only $56,588 of the fees incurred on their behalf. As a result of Baker & McKenzie's advisery role with regard to the DISC Issue, Petitioners agreed after Respondent fully conceded the case to pay only $40,000 of the unbilled fees incurred from December 1992 on their behalf. The $40,000 amount was paid by the Swansons from their Joint checking account. H.& S. Swansons' Tool Co., Mr. Swanson's closely held corporation and the client of record for bookkeeping purposes, had previously paid $16,588 for services rendered on petitioners' behalf between September and November, 1992.
>
> Petitioners agreed to allow Baker & McKenzie to recover any remaining unbilled fees in excess of the $56,588 Petitioners have paid to date to the extent that Petitioners prevail on * * * [their Motion for Reasonable Litigation Costs.] [Emphasis added.]

Thus, beyond the $40,000 agreed to, there is no legal obligation of petitioners to pay fees incurred on their behalf in the judicial proceeding.[28] Furthermore, based on the agreement

---

[28] We find that to the extent of the $16,588 paid by Swansons' Tool, petitioners did not "pay or incur" fees within the meaning of sec. 7430. Although the nature of the agreement under which
(continued...)

detailed in the affidavits of petitioners' counsel, they incurred no fees with respect to the preparation of their motion. Petitioners did not, therefore, incur fees in this matter in an amount greater than $40,000. See Marre v. United States, 38 F.3d 823, 828-829 (5th Cir. 1994); United States v. 122.00 Acres of Land, 856 F.2d 56 (8th Cir. 1988) (applying sec. 304(a)(2) of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. sec. 4654(a); fees were not actually "incurred" because the taxpayer had no legal obligation to pay his attorney's fees); accord SEC v. Comserv Corp., 908 F.2d 1407, 1414 (8th Cir. 1990) (construing the EAJA, which language the Court did not find to be significantly different from that in United States v. 122.00 Acres of Land, supra); see also Frisch v. Commissioner, 87 T.C. 858, 846 (1986) (lawyer representing himself pro se was not entitled to fees for his own services because such fees were not paid or incurred).

Because there is no mention in the affidavits of counsel regarding the liability of petitioners for costs other than fees incurred after December 1992, we find that petitioners are not similarly restricted with respect to an award of "reasonable court costs" under section 7430(c)(1)(A) or those items listed in section 7430(c)(1)(B)(i) and (ii).

---

[28](...continued)
such payment was made is unclear, the ultimate effect was to diminish the deterrent effect of the expense involved in seeking review of, or defending against, unreasonable Government action. See, e.g., SEC v. Comserv Corp., 908 F.2d 1407, 1413-1415 (8th Cir. 1990).

We must apportion the award of fees sought by petitioners between the DISC issue, for which respondent was not substantially justified, and the Algonquin property issue, for which respondent was substantially justified. Based on the record, we find that for the period December 1992 until September 1993,[29] a total of 312.9 hours was spent by counsel in connection with the Court proceedings. Of this amount, 158.8 hours were devoted to the DISC issue, 139.8 hours to the Algonquin property issue, and 14.3 hours to general case management. Based upon the $75-per-hour statutory rate, as adjusted by the COLA computed from 1981, we find that petitioners are entitled to an award for 166.4 hours of fees paid to counsel.[30]

As for expenses other than fees, petitioners have asked for total miscellaneous litigation costs in the amount of $6,512.33. Based upon our evaluation of the total time spent on the DISC issue, and our need to exclude miscellaneous expenses incurred with respect to the Algonquin property issue, we find that

---

[29]  Pursuant to petitioners' agreement with counsel, December 1992 was the month from which they agreed to pay $40,000 of unbilled fees incurred on their behalf. According to the affidavits of counsel, September 1993 was the last month in which fees were incurred to defend the DISC issue. Thus, this is the only period for which petitioners may recover fees in this matter.

[30]  We reach this figure based upon 158.8 hours devoted to the DISC issue and 7.6 of general case management apportioned to the DISC issue ((158.8 / (158.8 + 139.8) x 14.3 = 7.6).

petitioners are entitled to an award of miscellaneous expenses in the amount of $3,300.

To reflect the foregoing,

<u>An appropriate order will be issued and decision will be entered pursuant to Rule 155</u>.