T.C. Memo. 2007-131

UNITED STATES TAX COURT

GERARD AND AUDREY KATHLEEN HENNESSEY, Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1032-01.                    Filed May 24, 2007.

<u>W. Thomas Finley</u>, <u>Tammy S. Wood</u>, and <u>M. Seth Sosolik</u>,
for petitioners.

<u>Kathryn F. Patterson</u>, <u>Abbey B. Garber</u>, and <u>Adam L. Flick</u>,
for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

NIMS, <u>Judge</u>:  This matter is before the Court on
petitioners' motion for award of reasonable administrative and
litigation costs, filed pursuant to section 7430 and Rules 230
through 233, and request for a hearing.  Unless otherwise

indicated, section references are to sections of the Internal Revenue Code in effect at all relevant times hereunder. References to section 7430 are to the version of that section in effect at the time the petition was filed.  However, costs incurred on or before January 18, 1999, are subject to section 7430 as amended by the Taxpayer Relief Act of 1997, Pub. L. 105-34, secs. 1285, 1453, 111 Stat. 1038, 1055.  Costs incurred after January 18, 1999, are subject to section 7430 as amended by the Internal Revenue Service Restructuring and Reform Act of 1998 (RRA 1998), Pub. L. 105-206, sec. 3101, 112 Stat. 727.

Rule references are to the Tax Court Rules of Practice and Procedure.

Pursuant to section 7443A and Rules 180 and 183, this matter was assigned to and heard by Special Trial Judge Lewis R. Carluzzo.  His recommended findings of fact and conclusions of law were filed and served upon the parties by Order of July 5, 2005.

By the abovementioned Order, the parties were also given until August 31, 2005, to make specific written objections to the Special Trial Judge's recommended findings of fact and conclusions of law.  In response thereto, respondent filed a timely Notice of No Objection.  Petitioners timely filed 26 pages of Objections to Recommendations (Objections).

Rule 183(d) provides that due regard shall be given to the circumstance that the Special Trial Judge had the opportunity to evaluate the credibility of witnesses, and the findings of fact recommended by the Special Trial Judge shall be presumed to be correct.

We have duly considered petitioners' Objections and are not convinced thereby that the Special Trial Judge's meticulous and exhaustive recommendations are in any substantive way incorrect or incomplete.  We therefore conclude that they should be adopted as the report of the Court.  We have made no changes to the recommended findings of fact and conclusions of law, except to relocate a footnote into the text and renumber the remaining footnotes, change several headings, insert an explanatory parenthetical sentence, and modify certain introductory provisions.  The recommended findings of fact and conclusions of law of Special Trial Judge Lewis R. Carluzzo, as so modified, are hereinafter set forth as the report of the Court.

After concessions by respondent,[1] the issues for decision are as follows:  (1) Whether respondent's positions in the administrative and court proceedings are substantially justified; (2) whether petitioners unreasonably protracted the

---

[1] Respondent concedes that petitioners:  (1) Exhausted their administrative remedies, see sec. 7430(b)(1); (2) substantially prevailed, see sec. 7430(c)(4)(A)(i); and (3) satisfy the applicable net worth requirement, see sec. 7430(c)(4)(A)(ii).

administrative and court proceedings; and (3) whether the administrative and litigation costs claimed by petitioners are reasonable.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioners are husband and wife. They resided in Richardson, Texas, at the time that the petition was filed in this case. References to petitioner are to Audrey Kathleen Hennessey.

In 1982, petitioners formed Beacon Telephone Systems, Inc. (Beacon), a Texas corporation that was an S corporation for all years relevant here. See secs. 1361(a) and 1362. Petitioners have been the sole shareholders of Beacon since its incorporation. According to petitioners, Beacon's business involves the manufacture and installation of telephone systems that control building access. During the years in issue, Beacon's clients were located in Lubbock, Texas.

Petitioner was a professor at Texas Tech University (the University) in Lubbock, Texas, during all periods relevant here. During her 19-year tenure at the University, petitioner directed research at the University's Institute for Studies in Organizational Automation (the Institute).

In 1982, petitioner started an unincorporated consulting business, Industrial Scientific & Office Automation (ISOA Consulting), which shared the same acronym as the Institute.

In 1994, petitioner and Dr. Youling Lin (also a professor at the University) formed ISOA, Inc., a Texas corporation that was also an S corporation for some of the years in issue. Petitioner and Dr. Youling Lin each owned 50 percent of ISOA, Inc. Initially, ISOA, Inc., conducted business in Lubbock, Texas. In 1995, ISOA, Inc., moved the corporation's business operations to Richardson, Texas. In addition to ISOA, Inc., petitioner continued to operate ISOA Consulting.

As part of an arrangement with the University, ISOA, Inc., licensed intellectual property developed at the Institute to various third-party entities. In turn, ISOA, Inc., distributed a portion of the licensing fees received to the University and to student-inventors as royalty payments. In October 1996, ISOA, Inc., entered into a final royalty fee agreement with the University as to the distribution of the licensing fees received by ISOA, Inc. The licensing agreement between ISOA, Inc., and the University provided that ISOA, Inc., would retain 30 percent of the net licensing fees received, the University would receive 15 percent, student-inventors would receive 50 percent, and a corporate co-inventor would receive 5 percent. Additionally, per the terms of the licensing agreement, ISOA, Inc., could be obligated to refund any licensing fees to the third party if the patents were not approved for the licensed intellectual property. ISOA, Inc., used amounts from the licensing fees to pay various

expenses (for example, the cost of filing a patent application) before any royalties were paid.

According to petitioner, she typically traveled on approximately 150 trips per year as part of her duties with the University, ISOA Consulting, and ISOA, Inc. She testified that University professors could be reimbursed for employment-related travel expenses only to the extent of $1,000 per year.[2] Grants obtained by petitioner on behalf of the University also provided for some paid travel expenses. According to petitioner, any remaining travel expenses were paid by petitioners.

The University's policy required that petitioner provide an expense report for each trip regardless of whether her travel expenses were ultimately reimbursed. According to petitioner: (1) Original travel receipts were attached to the expense reports submitted to the University; (2) a travel reimbursement check from the University was usually received within 5 or 6 months after submitting an expense report; and (3) the reimbursement check did not always identify the specific travel expenses for which petitioner was being reimbursed. Petitioner did not keep records of what travel was reimbursed by the University, nor did

_____

[2] This testimony appears to be inconsistent with the reimbursement evidence from the University, as well as the amounts reported by petitioners as reimbursements on their tax returns and "general ledgers".

petitioner reconcile the amounts actually reimbursed by the University with the amounts submitted on the expense reports.

Petitioner also claimed to have paid the travel expenses of students not employed by the University who provided assistance on her trips. Petitioner included the students' travel expenses on her expense reports submitted to the University.[3] According to petitioners, Mr. Hennessey often accompanied petitioner on her business trips. For instance, Mr. Hennessey accompanied petitioner on her claimed business trips to the United Kingdom, Singapore, Brazil, and Italy. Petitioners testified that they would often conduct business related to the University, ISOA Consulting, Beacon, and/or ISOA, Inc., on a single trip. Petitioners' claimed business travels also included personal pleasure, for example a trip to their son's wedding in Maryland and to petitioner's mother in Alaska.

According to petitioners, many of their air travel expenses were paid with discounted tickets provided by their daughter, an airline employee. Additionally, petitioners claimed to have received significant discounts on car rentals and hotels. Petitioners testified that they either repaid their daughter in

---

[3] In addition, petitioner claimed to have often advanced the travel expenses of students employed by the University who traveled with her. These expenses were submitted to the University, and the reimbursement checks were endorsed by the students to petitioner. In addition, petitioner also testified that such reimbursements by the University could take "up to a year or a year and a half".

cash or paid her various expenses.[4]  Petitioners did not maintain any receipts or other documentary evidence with respect to the amounts paid to, or on behalf of, their daughter.

I.  Federal Income Tax Returns

A.  Petitioners' Individual Tax Returns

Some time prior to the end of 1993, petitioners sent to the Internal Revenue Service (IRS) a joint Form 1040, U.S. Individual Income Tax Return, for 1992.  That document had "Estimated" written on the top of the first page (1992 "Estimated" return).  Petitioners testified that they prepared and sent the 1992 "Estimated" return in that manner because they were not in possession of all their supporting documents and therefore were not able to determine the exact amounts to be reported on the return.

On or about August 12, 1994, petitioners sent to the IRS an unsigned Form 1040 for the 1993 taxable year.  Petitioners had written "Estimated" on the top of the first page of the unsigned 1993 return (1993 "Estimated" return).  The 1993 "Estimated" return did not have any attached schedules or forms.

Petitioners claimed that they were unable to file a final tax return for either 1992 or 1993 prior to the end of 1994 due to time restraints from their various work responsibilities,

---

[4] For example, on their 1994 return, petitioners deducted $17,874 for payments made to, or on behalf of, their daughter.

which included the incorporation of ISOA, Inc., and petitioner's competing work and travel demands, as well as a family crisis. On December 18, 1994, after being contacted by the IRS, petitioners sent a reply letter to the IRS which stated that they planned to have their 1992 and 1993 returns completed by January 15, 1995. Petitioners testified that their work responsibilities, as well as personal concerns, prevented them from completing their 1992 and 1993 returns by their self-imposed January 15, 1995, deadline.

On or about March 1, 1995, respondent received a second Form 1040 for the 1992 taxable year which again had "Estimated" written on the top of the first page.

On or about October 1, 1996, petitioners submitted an unsigned Form 1040 to the IRS for the taxable year 1993 (1993 unsigned return).

On December 30, 1996, petitioners filed a Form 1040 for the 1993 taxable year (1993 return). On the 1993 return, among other items, petitioners: (1) Reported a net operating loss (NOL) carryforward deduction from 1992 of $18,347; (2) claimed a deduction for travel expenses of $13,016 on Form 2106, Employee Business Expenses; and (3) deducted $17,293 of travel expenses on the Schedule C, Profit or Loss From Business, for ISOA Consulting.

On or about March 1, 1997, petitioners submitted an additional Form 1040 to the IRS for the 1993 taxable year with "Amended" written on the first page, as well as on several of the pages attached to the return (1993 "Amended" return). Petitioners reported a deduction for travel expenses of $29,978 on Form 2106.  Petitioners also deducted $21,594 for travel expenses on the Schedule C for ISOA Consulting.

Petitioners reported adjusted gross income on the four 1993 returns submitted to the IRS as follows:

| Return | Adjusted gross income |
|--------|----------------------|
| 1993 "Estimated" return | $54,300 |
| 1993 Unsigned return | 68,349 |
| 1993 Return | 32,937 |
| 1993 "Amended" return | 19,442 |

With the exception of the 1993 "Estimated" return which had no schedules or forms attached, each of the 1993 tax returns sent by petitioners to the IRS had double deducted expenses such as mortgage interest and real estate taxes.

On the Schedules C for ISOA Consulting, which were attached to the 1993 returns, petitioners reported the following amounts:[5]

|  | 1993 "Unsigned" return | 1993 Filed return | 1993 "Amended" return |
|--|------------------------|-------------------|-----------------------|
| Gross Income | $27,953 | $17,936 | $9,576 |
| Total Expenses | (35,659) | (40,707) | (46,674) |
| Net Loss | (7,706) | (22,771) | (37,098) |

_____

[5] There was no Schedule C attached to the 1993 "Estimated" return.

On December 30, 1996, petitioners filed with the IRS a Form 1040 for the 1994 taxable year (1994 return). On the 1994 return, petitioners reported negative adjusted gross income of $11,364 and an NOL carryforward of $51,284. Petitioners reported deductions for travel expenses of $9,258 and $24,847 on Form 2106 and Schedule C, respectively. On the Schedule C for ISOA Consulting, petitioners included "Royalties paid" of $46,200 as part of the cost of goods sold. Petitioners also claimed multiple deductions for some of the same expenses on the 1994 return.

In August 1997, petitioners sent to the IRS a second Form 1040 for the taxable year 1994 with the word "Revised" written at the top of the first page, as well as on several attached pages (1994 "Revised" return). On the 1994 "Revised" return, petitioners reported deductions for travel expenses of $5,101 and $29,533 on Form 2106 and Schedule C, respectively.

On the Schedules C for ISOA Consulting attached to the 1994 returns sent to respondent, petitioners reported the following amounts:

|  | 1994 Return[1] | 1994 "Revised" return |
|---|---|---|
| Gross income | ($2,692) | $13,055 |
| Total expenses | (42,272) | (34,939) |
| Net loss | (44,964) | [2](20,344) |

1 As noted by petitioners on both the Schedule C and Schedule E, Supplemental Income and Loss, attached to the 1994 return, these amounts included petitioners' portion of the gross receipts and expenses from ISOA, Inc.

2 This amount is a mathematical error and should have been $21,884.

On December 30, 1996, petitioners filed with the IRS a Form 1040 for the 1995 taxable year (1995 return). On the 1995 return, petitioners reported adjusted gross income of $25,439 and an NOL carryforward of $50,132. Petitioners claimed deductions for travel expenses of $9,428 and $21,565 on Form 2106 and Schedule C, respectively. Petitioners again claimed multiple deductions for some of the same expenses.

On or about March 14, 1997, respondent received a second Form 1040 from petitioners for the taxable year 1995 with "Amended" written at the top of the first page (1995 "Amended" return). On the 1995 "Amended" return, petitioners reported adjusted gross income of $6,395. Petitioners also reported deductions for travel expenses of $14,586 on both the Form 2106 and Schedule C.

On or about August 18, 1997, respondent received a Form 1040 from petitioners for the 1996 taxable year. On the 1996 return, petitioners reported adjusted gross income of $16,529 and an NOL carryforward of $36,157. On a Schedule A, Itemized Deductions, petitioners claimed a deduction for "Job travel: accom. in Dallas" in the amount of $59,479. Petitioners also claimed a deduction for travel expenses on Form 2106 of $36,714. On the Schedule C for ISOA Consulting attached to the 1996 return,

petitioners reported gross income of $38,220 and total expenses of $38,220.  On the 1996 return, petitioners claimed multiple deductions for some of the same expenses.

B.  Beacon's Tax Returns

On or about August 12, 1994, Beacon submitted an "Estimated" Form 1120S, U.S. Income Tax Return for an S Corporation, for the taxable year 1993 (Beacon's 1993 "Estimated" return) along with petitioners' 1993 "Estimated" return.  Beacon's 1993 "Estimated" return reflected that Beacon was on the cash receipts and disbursements method of accounting (cash basis) for Federal income tax purposes.[6]

On or about March 4, 1997, Beacon filed with the IRS a second Form 1120S for the taxable year 1993 (Beacon's 1993 return).  Beacon's 1993 return reported total income and total deductions of $13,691 and $24,248, respectively, for a loss of $10,557.  Beacon's total deductions included travel expenses of $13,717.

Along with petitioners' 1994 "Estimated" return, Beacon submitted for the taxable year 1994 a Form 1120S with "Estimated" written on the top of the first page (Beacon's 1994 "Estimated" return).  Beacon's 1994 "Estimated" return reported total income and total deductions of $5,000 and $2,710, respectively.

---

[6] At all relevant times during the years in issue, Beacon used the cash basis method of accounting for Federal income tax purposes.

On or about June 30, 1997, Beacon submitted a second Form 1120S for the taxable year 1994 with "Amended" written on the top of the first page (Beacon's 1994 "Amended" return).  On Beacon's 1994 "Amended" return, Beacon reported total income and total deductions of $4,936 and $17,760, respectively, for a loss of $12,824.  The total deductions included travel expenses of $9,887.

On or about March 14, 1997, Beacon submitted a 1995 Form 1120S with "Amended" written on the top of the first page (Beacon's 1995 "Amended" return).[7]  On Beacon's 1995 "Amended" return, Beacon reported total income and total deductions of $6,454 and $14,870, respectively, for a loss of $8,416.  The total deductions for 1995 included travel expenses of $5,615.

Beacon filed a Form 1120S for the taxable year 1996.  On the 1996 Form 1120S, Beacon reported total income and total deductions of $10,564 and $12,540, respectively, for a loss of $1,976.  For 1996, Beacon deducted travel expenses of $6,572.

C.  ISOA, Inc.'s Tax Returns

On or about July 10, 1995, respondent received ISOA, Inc.'s Form 1120S for the 1994 taxable year (ISOA, Inc.'s 1994 return). ISOA, Inc.'s 1994 return was prepared on the cash basis method of accounting.  ISOA, Inc., reported gross profit of $18,749 and

---

[7] Based on the record, there is no indication that Beacon submitted any other 1995 return prior to Beacon's 1995 "Amended" return.

total deductions of $10,384 for 1994. ISOA, Inc.'s total deductions included travel expenses of $8,228.

On or about September 23, 1996, respondent received a 1995 Form 1120S (ISOA, Inc.'s 1995 return) prepared by Edward Chui (Mr. Chui), the corporation's certified public accountant. ISOA, Inc.'s 1995 return was prepared on the cash basis method of accounting. The 1995 Form 1120S reported total income of $191,383 and total deductions of $170,679, for ordinary income of $20,704. Deductions included "Royalties Paid To Investors" of $104,860 and travel expenses of $21,069. On a balance sheet attached to ISOA, Inc.'s 1995 return, the corporation listed "Advances From Others" of $195,000 under "Other Current Liabilities". On the Statement of Assets, Liability & Equity for the taxable year ending December 31, 1995, ISOA Inc. also reported a current liability for "Unearned Income (Escrow)" of $195,000.

On August 16, 1996, ISOA, Inc., terminated its S corporation election and was thereafter a C corporation.

On or about September 13, 1996, respondent received an amended 1994 Form 1120S for ISOA, Inc., for the taxable period beginning August 18, 1994, and ending December 31, 1994, (ISOA Inc.'s 1994 amended return) prepared by Mr. Chui. ISOA, Inc.'s

1994 amended return was prepared on the cash basis method of accounting. ISOA, Inc.'s 1994 amended Form 1120S reflected ordinary income of $12,894.

On or about March 19, 1997, respondent received from ISOA, Inc., a Form 1120S for the taxable year beginning January 1, 1996, and ending August 15, 1996. ISOA, Inc.'s 1996 return was prepared on the cash basis method of accounting. ISOA, Inc.'s 1996 Form 1120S reported taxable income of zero and total deductions of $69,937, for a loss of $69,937. The total deductions included travel expenses of $22,856.

On or about March 19, 1997, respondent received ISOA, Inc.'s Form 1120, U.S. Corporation Income Tax Return, for the taxable year beginning August 16, 1996, and ending December 31, 1996. The 1996 Form 1120 reflected that the return was prepared on the accrual method of accounting. On the 1996 Form 1120, ISOA, Inc., reported total income of $446,454 and total deductions of $482,825, for a loss of $36,371. On the balance sheet attached to the Form 1120, ISOA, Inc., listed under "Other Current Liabilities" ending balances for "Royalty Payable" and "Deferred And Unearned Income" of $185,500 and $195,000, respectively.

II. Respondent's Examinations

On June 12, 1996, respondent notified petitioners by letter that their 1992 individual tax return had been selected for examination in respondent's Lubbock office. Revenue Agent Susan

Sutton (Agent Sutton) was responsible for the examination of petitioners' 1992 taxable year. As part of the initial examination for 1992, Agent Sutton requested that petitioners provide, among other items, their 1991 through 1993 tax returns. Respondent also scheduled an appointment in August to meet with petitioners and discuss the examination.

Petitioners engaged Carolyn Stephenson (Ms. Stephenson), a certified public accountant, to represent them during their examination. Ms. Stephenson did not prepare petitioners' 1992 return, nor did she request to see petitioners' 1992 return.

In their initial discussion Ms. Stephenson advised Agent Sutton that some of petitioners' documents had been lost or misplaced. Agent Sutton allowed petitioners until August 21, 1996, to gather the documents originally requested.

On July 9, 1996, Agent Sutton issued to petitioners an Information Document Request (IDR) which requested, in part, that petitioners provide by August 21, 1996, their individual tax returns for the 1991 through 1995 taxable years, as well as Beacon's tax returns for the taxable years 1991 through 1995. In addition, the IDR requested "books, records, invoices, receipts, statements, and any other data to verify" income and expenses with respect to petitioners' 1992 tax year. At petitioners'

request for additional time to gather the documentation, Agent Sutton extended the time for petitioners' response to October 1, 1996.

On or about October 1, 1996, petitioners provided Ms. Stephenson with a box of documentation related to petitioners' travel activities.  This documentation also included petitioners' 1992 return.

On October 1, 1996, Ms. Stephenson met with Agent Sutton and provided her some documents, including bank statements and charge card statements, to review with respect to petitioners' 1992 taxable year.  Ms. Stephenson also informed Agent Sutton that petitioners had been unable to collect some of the requested documents, including travel receipts and reimbursement documentation from the University.  The meeting between Ms. Stephenson and Agent Sutton lasted approximately 1 hour.

On October 3, 1996, Agent Sutton issued an IDR which requested, in part, the "items requested in the original appointment letter that has [sic] not yet been provided."  The IDR also requested, in part, all tax returns from petitioners and Beacon for the taxable years 1991 through 1995 and ISOA, Inc., for the taxable years since its incorporation.  In addition, Agent Sutton requested supporting documentation with respect to a

number of petitioners' claimed expenses. Ms. Stephenson notified Agent Sutton that the requested information would be provided by the middle of November.

On November 15, 1996, Agent Sutton issued an IDR and requested, among other items, substantiation of the income and expenses with respect to petitioners' 1993 through 1995 taxable years, Beacon's 1992 through 1995 taxable years, and "any other entities which [petitioners] control or own" for the taxable years 1992 through 1995. The IDR requested that this information be provided by December 5, 1996.

In December 1996, Agent Sutton spent 2 days at Ms. Stephenson's office reviewing the documentation made available by petitioners. On December 30, 1996, during respondent's examination, petitioners filed the 1993 return, 1994 return, and 1995 return.

On January 2, 1997, respondent notified petitioners by letter that their individual returns for the taxable years 1993 through 1995 were also under examination, as well as Beacon's tax returns for the 1992 through 1995 taxable years and ISOA Inc.'s tax returns for the 1994 and 1995 taxable years.

By letter dated January 17, 1997, petitioners requested that the examination of the taxable years 1993 through 1995 be transferred to respondent's Dallas, Texas, office.

On January 23, 1997, Agent Sutton issued an IDR which again requested, in part, copies of Beacon's and ISOA, Inc.'s tax returns for the taxable years in issue, as well as the general ledgers which support all of the tax returns under examination. Petitioners requested additional time to comply with the IDR because of the large volume of documents in petitioners' possession and the need to review each adjustment on their "general ledgers". On February 20, 1997, petitioners requested additional time in order to reconstruct some records and to put the 1994 and 1995 taxable years in a general ledger format. Additionally, Ms. Stephenson notified Agent Sutton and claimed that during this time petitioner's work demands were also "overwhelming to her."

By letter dated February 10, 1997, respondent denied petitioners' request to transfer the examination to respondent's Dallas, Texas, office.

On March 10, 1997, Agent Sutton received from petitioner what have been referred to by petitioners as "general ledgers". On March 14, 1997, Agent Sutton received revised general ledgers for 1994 and 1995. (We have not undertaken to evaluate the so-called general ledgers as to whether they fall within a normal definition of "general ledger". See Webster's Third New International Dictionary (1986), which defines general ledger as follows: "the principal and controlling ledger of a business

enterprise containing individual or controlling accounts for all assets, liabilities, net worth items, revenue, and expenses".) The general ledgers provided to Agent Sutton list dates, amounts, and types of expenses, but generally did not identify the business purpose of the listed expense or provide any supporting documentation. Petitioners provided Agent Sutton with revised versions of the general ledgers several times as petitioners continued to sort through their information. Additionally, petitioners claimed that they were unable to provide supporting documentation to Agent Sutton along with the "general ledgers" because this information was located in Dallas. Ms. Stephenson added that any such documents by themselves would not have been helpful without input from petitioner, whom she claimed was busy with work and travel at this time.

The examination of petitioners' "general ledgers" raised additional concerns with Agent Sutton. Many of the amounts on the "general ledgers" provided by petitioners did not reconcile to corresponding deductions on any of the numerous tax returns provided by petitioners during the examination. Ms. Stephenson noted that even with the final amounts on the "general ledgers", Agent Sutton might not "find the exact number on the tax return." In addition, some expenses listed on the "general ledgers" included amounts which had been reimbursed by the University. For example, one "general ledger" indicated that the

reimbursements from the University to petitioner had been equally split between petitioner's employee business expenses at the University and ISOA, Inc. Additionally, the amount of petitioner's travel expenses at the University on a general ledger for 1993 did not equal the travel expenses claimed on the 1993 Form 2106. The "general ledgers" also indicated that petitioners often claimed per diem expenses as well as hotel and meal expenses for the same travel. There were also personal expenses, including women's clothing and car rental expenses for petitioners' son, which were included on the "general ledgers" and deducted by petitioners on their tax returns under examination.

During the examination, Agent Sutton was also provided with a draft audit report prepared by the University. The draft audit report raised questions regarding irregularities with respect to petitioner's expense reimbursements from the University.

On May 29, 1997, after examining the information provided to that date, Agent Sutton issued an IDR to petitioners with more than 300 questions and document requests. This again included, in part, requests for substantiation for the claimed business expense deductions, as well as an explanation of the $195,000 of "Advances From Others" with respect to ISOA, Inc.'s 1995 return.[8]

_____

[8] Throughout the proceeding, the parties refer to this as the "deferred income" issue. We do likewise.

In a June 3, 1997, letter to Agent Sutton, Ms. Stephenson requested that a sampling technique be used with respect to the requested documents since petitioners would have to review over 24,000 documents in response to the latest IDR. Agent Sutton denied petitioners' request to sample the expenses listed on the returns and the related substantiation because there were too many discrepancies in the returns and submitted documentation to warrant sampling petitioners' records. However, Agent Sutton informed Ms. Stephenson that petitioners should provide only the information and documentation that was possible without disrupting their professional lives or spending excessive sums of money.

On June 30, 1997, petitioners sent their response to the latest IDR to Agent Sutton. For example, petitioners' response to a request for hotel receipts was "Samples are attached". However, respondent did not receive any such receipts attached to the IDR. In describing the $195,000 of licensing fees received by ISOA, Inc., in 1995 but not reported in the corporation's taxable income, petitioners stated that this amount was "held for $1.5 million buyout of intellectual property from [the University] within 5 years. Funds can be used to offset approved costs of licensing intellectual property per [ISOA, Inc./the University] agreement. [ISOA, Inc.] must show reasonable progress each year toward accumulation of the $1.5 million".

On August 25, 1997, Agent Sutton prepared and sent a Referral Report of Potential Criminal Fraud Cases to the Criminal Investigation Division (CID) of the IRS with respect to petitioners, Beacon, and ISOA, Inc., for the taxable years under examination (the criminal fraud referral). The criminal fraud referral for petitioners and Beacon was based, in part, on the substantial overstatement of deductions with respect to income and the overall incompleteness of documentation provided by petitioners at that point in the examination. With respect to ISOA, Inc., the criminal fraud referral was based largely on the $195,000 of "deferred income" from licensing fees that was omitted from income and classified by ISOA, Inc., as "Advanced Royalties" on the 1995 return. Special Agent Mike Metzler of the CID informed petitioners that their individual returns for the taxable years at issue were under a criminal fraud investigation.

On January 20, 1998, Agent Sutton issued a Revenue Agent's Report (RAR) with respect to petitioners' 1992 taxable year (1992 RAR). The 1992 RAR proposed an income tax deficiency of $14,750 and total penalties of $14,604. The 1992 RAR, in part, disallowed all of petitioners' claimed Schedule C deductions on the basis that ISOA Consulting was not a trade or business and that the claimed expenses were either nondeductible personal expenses or that they had been deducted by petitioners elsewhere on the 1992 return.

On February 2, 1998, the criminal fraud investigation was closed without a recommendation for prosecution.

On February 13, 1998, respondent issued a notice of deficiency to petitioners with respect to their 1992 taxable year.

On March 10, 1998, Agent Sutton informed petitioners that the examination was expanding to include the 1996 taxable year with respect to petitioners, Beacon, and ISOA, Inc.  At that time, Agent Sutton issued an IDR with respect to the 1996 tax returns for petitioners, Beacon, and ISOA, Inc.[9]

On August 12, 1998, Agent Sutton issued separate proposed RARs for petitioners, Beacon, and ISOA, Inc., with respect to the remaining taxable years under examination.  Agent Sutton offered to have a conference with petitioners and Ms. Stephenson on August 25, 1998, to discuss the proposed adjustments.  Agent Sutton stated that the proposed RARs were meant to let petitioners "know what the proposed adjustments were and provide [Ms. Stephenson] and the taxpayers time to talk to me or provide more books and records."

On August 24, 1998, after the proposed RARs had been issued, Ms. Stephenson notified Agent Sutton that petitioners did not

---

[9] The request included the tax returns for ISOA, Inc., for the taxable year 1996 ending on August 15 and December 31.

agree with the adjustments in the proposed RARs sent on August 12, 1998, and requested that the returns under examination be reviewed by respondent's Appeals Office.

On August 27, 1998, respondent issued to petitioners a 30-day letter for their 1993 through 1995 individual taxable years and a 30-day letter for their 1996 individual taxable year. Respondent proposed deficiencies, additions to tax, and penalties as follows:[10]

| Year | Deficiency | Additions to tax sec. 6651(a)(1) | Penalty sec. 6663 |
|------|-----------|----------------------------------|-------------------|
| 1993 | $25,046 | $2,866 | $18,785 |
| 1994 | 31,754 | 8,019 | 23,815 |
| 1995 | 74,895 | 11,277 | 56,171 |
| 1996 | 33,656 | --- | 25,242 |

Respondent, in part, disallowed a number of claimed business expense deductions claimed by petitioners for lack of substantiation and business purpose. Respondent also asserted that several of petitioners' claimed business expense deductions were either reimbursed by the University, personal in nature, or deducted multiple times among petitioners, Beacon, and ISOA, Inc.

On August 27, 1998, respondent issued separate 30-day letters to Beacon and ISOA, Inc., with respect to the corporations' taxable years under examination. The 30-day letter

---

[10] Respondent and petitioners resolved the issues that arose during the examination of petitioners' 1992 individual tax return with no additional tax or penalties due.

sent to ISOA, Inc., stated, in part, that the company had failed to report $195,000 of income in 1995 which had been erroneously classified by petitioners as "deferred income". Specifically, Agent Sutton noted that ISOA, Inc., received the $195,000 in licensing fees from the company's clients with no restrictions on the use of the funds and that the licensing fees had been deposited in the company's bank account like all other receipts by the company.

By letter dated October 28, 1998, Anthony Rebollo (Mr. Rebollo), an attorney hired by petitioners, protested the 30-day letters issued to petitioners, Beacon, and ISOA, Inc., and requested an Appeals conference to discuss respondent's proposed adjustments made with respect to all of the tax returns under examination. Mr. Rebollo also noted, in part, that "the taxpayers' records are voluminous and, with respect to some issues, can be difficult and time consuming to analyze" and that petitioners' "extremely hectic schedule requiring extensive travel and a great deal of stress" had "contributed to some of the problems" in petitioners' case.

In November 1998, petitioners were notified that their case had been transferred to respondent's Appeals Office. Appeals Officer Estevan Medina (Appeals Officer Medina) was assigned to review petitioners' 1993 through 1996 taxable years. By letter dated March 11, 1999, Appeals Officer Medina informed Ms.

Stephenson as to the general scope and course of the Appeals review process with respect to petitioners. Appeals Officer Medina also informed Ms. Stephenson as to the categories of expenses with respect to petitioners, Beacon, and ISOA, Inc., that would be examined. Appeals Officer Medina further noted that the examiner would initially apply a sampling technique to review petitioners' substantiation. Ms. Stephenson was subsequently informed by Appeals Officer Medina that any settlement with respect to petitioners' 1992 taxable year was irrelevant because each year stands on its own and that each issue raised during the original audit had to be addressed at Appeals.

After discussing petitioners' case with Appeals Officer Medina, Ms. Stephenson notified petitioners by letter as to the nature of the Appeals Office review. Specifically, Ms. Stephenson informed petitioner that if the sampling process did not yield sufficient results then the examiner might deny a deduction in whole or in part, or "she will have to look at every item of deduction".

Revenue Agent Jean Wharton (Agent Wharton) was assigned to examine petitioners' records during the Appeals Office review. Petitioners did not support Appeals Officer Medina's suggestion to add a second revenue agent to expedite the Appeals examination.

From May to September 1999, Agent Wharton spent 14 days at petitioners' residence reviewing records and documentation with respect to the 1993 through 1996 taxable years. This included more than 20 boxes of travel documentation from petitioners and their related entities. This documentation included, among other items, restaurant receipts, hotel receipts, and business cards.

During Appeals consideration, Agent Wharton often did not receive adequate documentation from petitioners and Ms. Stephenson in response to questions raised during her examination. For example, in some cases the only substantiation Agent Wharton received with respect to the business purpose of certain travel expenses was business cards.

During her review, Agent Wharton noted that she had several versions of "general ledgers" and that none completely reconciled to any of the returns in respondent's possession. For example, Agent Wharton determined that in 1995, petitioner frequently traveled from Lubbock, Texas, to Richardson, Texas, on day trips with no overnight stays. However, in addition to the actual travel expenses, petitioner claimed per diem expenses for at least 100 days. Petitioner also claimed a per diem expense for time in Hawaii while she waited to have a visa approved for a trip to Australia. During her review, Agent Wharton found that petitioners deducted $59,479 on their 1996 Schedule A for "Job travel: accom. in Dallas". Petitioners' 1996 general ledger

indicated that this amount included petitioners' mortgage payments, car loan payments, and payments for home furnishings. Agent Wharton also determined that a majority of shipping expenses were for items shipped to family members for which there was no clear business purpose.

On January 12, 2000, Appeals Officer Medina met with petitioners, Ms. Stephenson, and Mr. Rebollo to discuss Agent Wharton's review and the adjustments he was willing to concede in order to facilitate a possible settlement. Petitioners rejected the settlement proposal. Subsequent settlement proposals by Ms. Stephenson were rejected by Appeals Officer Medina.

By letter to Mr. Rebollo dated January 28, 2000, Appeals Officer Medina again explained the results of Agent Wharton's examination and respondent's position with respect to the proposed adjustments.

In April 2000, petitioners engaged new counsel, W. Thomas Finley (Mr. Finley) to represent them in their dispute. After an April 28, 2000, meeting, Mr. Finley agreed to provide Appeals Officer Medina additional substantiation prior to any decision by the Appeals Office.

On June 20, 2000, Mr. Finley sent a new settlement proposal to Appeals Officer Medina, along with additional substantiation and spreadsheets prepared by Ms. Stephenson. In a letter to Appeals Officer Medina dated August 1, 2000, Ms. Stephenson

provided a summary of petitioners' positions with respect to the issues of the latest settlement proposal. With respect to the deferred income issue, Ms. Stephenson stated that this amount was "the accumulation of royalties owed to inventors" and that ISOA, Inc., was "merely a conduit for distributing these royalty payments to the inventors." Ms. Stephenson for the first time also claimed that ISOA, Inc.'s 1995 return erroneously indicated that the corporation was on the cash basis method of accounting. In addition, Ms. Stephenson stated that ISOA, Inc., was an accrual basis taxpayer and that the proper accounting treatment of the "deferred income" would have been "to recognize the royalty income when received and set up a corresponding payable to the inventors for the same amount."

By letter to Ms. Stephenson dated August 11, 2000, Appeals Officer Medina rejected petitioners' June 2000 settlement proposal.

III. The Notice of Deficiency

On October 19, 2000, respondent issued to petitioners a notice of deficiency for their 1993 through 1996 individual taxable years. The notice of deficiency also included adjustments with respect to Beacon for the taxable years 1993 through 1996 and ISOA, Inc., for the taxable years 1995 and

1996.[11]  In the notice, respondent asserted, in part, that numerous business expenditures claimed by petitioners, Beacon, and ISOA, Inc., had not been adequately substantiated and did not have a business purpose.  Respondent also determined that Beacon and ISOA, Inc., had failed to properly include certain amounts in income.  Specifically, respondent determined that ISOA, Inc., failed to properly include the $195,000 of "deferred income" in the corporation's 1995 taxable income.  The notice of deficiency determined deficiencies, additions to tax, and accuracy-related penalties, as follows:[12]

| Year | Deficiency | Additions to tax sec. 6651(a)(1) | Penalty sec. 6662 |
| --- | --- | --- | --- |
| 1993 | $23,733 | $2,538 | $4,747 |
| 1994 | 28,514 | 7,209 | 5,703 |
| 1995 | 75,089 | 11,306 | 15,018 |
| 1996 | 28,307 | --- | 5,661 |

IV.  The Petition and Proceedings to Date

On January 17, 2001, petitioners timely filed a petition with the Court.  Petitioners placed all of the amounts in the notice of deficiency in dispute.  Petitioners alleged, among other things, that the claimed business expense deductions with respect to petitioners' business activities had been adequately

---

[11] The adjustments with respect to ISOA, Inc., for the taxable year 1996 were for the corporation's taxable year ending Aug. 15, 1996.

[12] The sec. 6663 fraud penalty was conceded as a result of Appeals Office consideration.

substantiated and were ordinary and necessary business expenses. The petition further alleged that Beacon and ISOA, Inc., did not fail to properly report any items of taxable income.

On March 8, 2001, Mary Kay McIlyar (Ms. McIlyar), the District Counsel attorney to whom the case was assigned, filed an answer to the petition which denied all of petitioners' assignments of error.

Ms. McIlyar met with Agent Wharton, Ms. Stephenson, and Mr. Finley to discuss petitioners' case. At this meeting, it was decided that petitioners would provide "mockup" tax returns which would include only the amounts that could be adequately substantiated by petitioners. These "mockup" tax returns would not be filed with the IRS.

Years after petitioners' filed returns, "Estimated" returns, "Revised" returns, and "Amended" returns, Ms. Stephenson prepared the "mockup" tax returns along with "general ledgers" to support the amounts on these returns. Between June and September of 2001, Mr. Finley provided Ms. McIlyar with the "mockup" returns for the entities and taxable years in issue. Many of the amounts on the "mockup" tax returns differed from the amounts on the tax returns petitioners had previously submitted to the IRS. Revenue Agent Richard Laakso (Agent Laakso) was assigned to examine the "mockup" returns and the "general ledgers" prepared by Ms. Stephenson. Agent Laakso selected a limited number of entries

from the most recent "general ledgers" to verify the amounts on the "mockup" tax returns.  During his review of the "mockup" tax returns, Agent Laakso occasionally needed to request additional substantiation.  After reviewing the "mockup" tax returns, Agent Laakso discussed settlement proposals for each taxable year in issue with Ms. Stephenson.  The settlement proposals reached between Agent Laakso and Ms. Stephenson were then submitted to Ms. McIlyar and Mr. Finley to negotiate any possible final settlements.

On December 5, 2001, Mr. Finley sent respondent a separate settlement offer for each of the years 1993 through 1996 with total tax liabilities for each year as follows:

| Year | Total tax liability |
|------|---------------------|
| 1993 | $5,000 |
| 1994 | 5,450 |
| 1995 | 7,700 |
| 1996 | 1,750 |

On February 11, 2002, the settlement offers for 1993 and 1994 were accepted by Ms. McIlyar in the amounts proposed by Mr. Finley.

On February 19, 2002, Ms. McIlyar proposed settlements for the 1995 and 1996 taxable years as follows:

| Year | Total tax liability | Penalty sec. 6662(a) |
|------|---------------------|----------------------|
| 1995 | $12,921 | --- |
| 1996 | 7,330 | $1,466 |

On April 12, 2002, a stipulated decision document was signed and submitted to the Court reflecting the following settlement:

| Year | Deficiency | Penalty sec. 6662(a) |
|------|-----------|----------------------|
| 1993 | $5,000 | --- |
| 1994 | 5,450 | --- |
| 1995 | 12,921 | --- |
| 1996 | 7,330 | $1,466 |

On May 14, 2002, petitioners filed their motion for an award of costs.[13]  Accordingly, on May 14, 2002, the stipulated decision was vacated, recharacterized, and filed as a stipulation of settlement.  On June 26, 2002, petitioners filed an amended motion for costs.

On August 26, 2002, respondent filed an objection to petitioners' amended motion for an award of costs.  According to respondent's objection:  (1) The positions maintained by respondent in the administrative and court proceedings were substantially justified; (2) petitioners unreasonably protracted both the administrative and court proceedings; (3) petitioners did not incur any costs in connection with either the administrative or court proceedings; and (4) the administrative and litigation costs claimed by petitioners were unreasonable in amount.

---

[13] Respondent's counsel agreed to the settlement unaware of petitioners' intention to file the motion here under consideration after the stipulated decision had been entered.

On April 30, 2003, petitioners filed a reply.  Pursuant to petitioners' request, an evidentiary hearing was conducted on petitioners' motion in Dallas, Texas.

OPINION

Administrative costs incurred in connection with an administrative proceeding may be awarded under section 7430(a) only if a taxpayer:  (1) Is the prevailing party, and (2) did not unreasonably protract the administrative proceeding.  Sec. 7430(a) and (b)(3).[14]  Similarly, litigation costs incurred in connection with a court proceeding may be awarded only if a taxpayer:  (1) Is the prevailing party; (2) has exhausted his or her administrative remedies within the IRS; and (3) did not unreasonably protract the court proceeding.  Sec. 7430(a) and (b)(1), (3).

A taxpayer must satisfy each requirement in order to be entitled to an award of administrative or litigation costs under section 7430.  Sec. 7430(a)(1) and (2), (c)(1) and (2); Rule 232(e).

To be a "prevailing party", the taxpayer must:  (1) Substantially prevail with respect to either the amount in

---

[14] Administrative costs include only the costs incurred on or after the earlier of:  (1) The date of receipt by the taxpayer of the decision by the Appeals Office; (2) the date of the notice of deficiency; or (3) the date on which the first letter of proposed deficiency which allows the taxpayer an opportunity for administrative review in the IRS Appeals Office is sent.  Sec. 7430(c)(2).

controversy or the most significant issue or set of issues presented; and (2) satisfy the applicable net worth requirement. Sec. 7430(c)(4)(A).  Respondent concedes that petitioners have satisfied the requirements of section 7430(c)(4)(A).  According to respondent, however, petitioners are not prevailing parties within the meaning of section 7430 because respondent's positions in the administrative and court proceedings were substantially justified.  Sec. 7430(c)(4)(B)(i).

In general, the Commissioner's position is substantially justified if, based on all of the facts and circumstances and the legal precedents relating to the case, the Commissioner acted reasonably.  Pierce v. Underwood, 487 U.S. 552 (1988); Sher v. Commissioner, 89 T.C. 79, 84 (1987), affd. 861 F.2d 131 (5th Cir. 1988).  In other words, to be substantially justified, the Commissioner's position must have a reasonable basis in both law and fact.  Pierce v. Underwood, supra; Rickel v. Commissioner, 900 F.2d 655, 665 (3d Cir. 1990), affg. in part and revg. in part on other grounds 92 T.C. 510 (1989).  A position is substantially justified if the position is "justified to a degree that could satisfy a reasonable person."  Pierce v. Underwood, supra at 565 (construing similar language in the Equal Access to Justice Act).  Thus, the Commissioner's position may be incorrect but nevertheless be substantially justified "'if a reasonable person

could think it correct'". <u>Maggie Mgmt. Co. v. Commissioner</u>, 108
T.C. 430, 443 (1997) (quoting <u>Pierce v. Underwood</u>, <u>supra</u> at 566
n.2).

The relevant inquiry is "whether * * * [the Commissioner]
knew or should have known that * * * [his] position was invalid
at the onset". <u>Nalle v. Commissioner</u>, 55 F.3d 189, 191 (5th Cir.
1995), affg. T.C. Memo. 1994-182. We look to whether the
Commissioner's position was reasonable given the available facts
and circumstances at the time that the Commissioner took his
position. <u>Maggie Mgmt. Co. v. Commissioner</u>, <u>supra</u> at 443;
<u>DeVenney v. Commissioner</u>, 85 T.C. 927, 930 (1985). In deciding
whether the Commissioner's position was substantially justified,
a significant factor is whether, on or before the date the
Commissioner assumed the position, the taxpayer provided "all
relevant information under the taxpayer's control and relevant
legal arguments supporting the taxpayer's position to the
appropriate Internal Revenue Service personnel."[15] Sec.
301.7430-5(c)(1), Proced. & Admin. Regs.

The fact that the Commissioner eventually concedes or loses
a case does not establish that his position was unreasonable.

---

[15] "Appropriate Internal Revenue Service personnel" are
those employees who are reviewing the taxpayer's information or
arguments, or employees who, in the normal course of procedure
and administration, would transfer the information or arguments
to the reviewing employees. Sec. 301.7430-5(c)(1), Proced. &
Admin. Regs.

Estate of Perry v. Commissioner, 931 F.2d 1044, 1046 (5th Cir. 1991); Sokol v. Commissioner, 92 T.C. 760, 767 (1989). However, the Commissioner's concession is a factor to be considered. Powers v. Commissioner, 100 T.C. 457, 471 (1993), affd. in part, revd. in part and remanded on another issue 43 F.3d 172 (5th Cir. 1995).

As relevant here, the position of the United States under consideration with respect to the recovery of administrative costs is the position taken by the Commissioner as of the date of the notice of deficiency. Sec. 7430(c)(7)(B)(ii); Fla. Country Clubs, Inc. v. Commissioner, 122 T.C. 73 (2004), affd. 404 F.3d 1291 (11th Cir. 2005). The position of the United States under consideration with respect to the recovery of litigation costs is the position taken by the Commissioner in the answer to the petition. Bertolino v. Commissioner, 930 F.2d 759, 761 (9th Cir. 1991); Sher v. Commissioner, 861 F.2d at 134-135; see sec. 7430(c)(7)(A). Ordinarily, we consider the reasonableness of each of these positions separately in order to account for a change in the Commissioner's position. Maggie Mgmt. Co. v. Commissioner, supra at 442 (citing Huffman v. Commissioner, 978 F.2d 1139, 1144-1147 (9th Cir. 1992), affg. in part and revg. in part on other grounds T.C. Memo. 1991-144). In the present case, however, we need not follow this approach because respondent's

position was essentially the same in the administrative and Court proceedings.  See Maggie Mgmt. Co. v. Commissioner, supra at 442.

The parties agree, more or less, that prior to the settlement, the items at issue as a result of respondent's examination were primarily:  (1) Petitioners' claimed business expense deductions; and (2) ISOA, Inc.'s "deferred income" in 1995 in the amount of $195,000.  We have previously adopted an issue-by-issue approach to the awarding of costs under section 7430, apportioning the requested award among the issues according to whether the position of the United States was substantially justified.  Swanson v. Commissioner, 106 T.C. 76, 102 (1996); O'Bryon v. Commissioner, T.C. Memo. 2000-379; see also Powers v. Commissioner, 51 F.3d 34, 35 (5th Cir. 1995).  We follow that approach here and separately discuss whether respondent's position was substantially justified with respect to each of the above issues.[16]

## I. Business Expense Deductions

In the notice of deficiency, respondent disallowed various business expense deductions claimed on petitioners' individual tax returns, as well as the tax returns of Beacon and ISOA, Inc.,

---

[16] Much of petitioners' presentation at the hearing addressed the criminal referral and the proposed civil fraud penalty.  Although the civil fraud penalty was proposed in the revenue agent's report, it was neither included in the notice of deficiency nor the answer.  Consequently, the substantial justification of respondent's proposed imposition of the civil fraud penalty is not considered here.  See sec. 7430(c)(7).

because petitioners did not: (1) Adequately substantiate those deductions; and/or (2) establish the business purpose for the deductions.

We begin with a fundamental proposition of Federal income taxation. Deductions are matters of legislative grace. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); Segel v. Commissioner, 89 T.C. 816, 842 (1987). Taxpayers are required to substantiate the claimed deductions by maintaining records necessary to establish entitlement and the amount of the deduction in question. Sec. 6001; Meneguzzo v. Commissioner, 43 T.C. 824, 831-832 (1965); sec. 1.6001-1(a), Income Tax Regs.; see Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Welch v. Helvering, 290 U.S. 111, 115 (1933); Segel v. Commissioner, supra; Hradesky v. Commissioner, 65 T.C. 87, 90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976). In general, the burden to demonstrate entitlement to a claimed deduction rests with the taxpayer. Rule 142(a); Underwood v. Commissioner, 56 F.2d 67 (4th Cir. 1932), revg. 20 B.T.A. 1117 (1930).

Generally, section 162(a) allows "as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business", including a taxpayer's trade or business as an employee. See Primuth v. Commissioner, 54 T.C. 374, 377-378 (1970). To support expenses

entitled to a section 162(a) deduction, a taxpayer must provide evidence to establish a sufficient connection between the deduction and his trade or business.  Gorman v. Commissioner, T.C. Memo. 1986-344.

Certain expenses that otherwise qualify for deduction under section 162(a) require enhanced, more specified substantiation under section 274.  These include travel, food, and entertainment expenses.  For these items, taxpayers must show that an expense was "directly related" to the business activity, and must provide the business purpose, amount, and time and place of the expenditure.  Sec. 274(a); sec. 1.274-5T(b)(2), Temporary Income Tax Regs. 50 Fed. Reg. 46014 (Nov. 6, 1985).  In order to substantiate these types of deductions by means of adequate records, a taxpayer must maintain a diary, a log, or a similar record, and documentary evidence that, in combination, are sufficient to establish each element of each expenditure or use. Sec. 1.274-5T(c)(2)(i), Temporary Income Tax Regs., 50 Fed. Reg. 46017 (Nov. 6, 1985).

If the allowance of a deduction claimed on a return is challenged by respondent, respondent is not obliged to concede the taxpayer's entitlement to the deduction until adequate substantiation for the deduction has been provided by the

taxpayer.  See Huynh v. Commissioner, T.C. Memo. 2002-110;
Gealer v. Commissioner, T.C. Memo. 2001-180; O'Bryon v.
Commissioner, supra; Cooper v. Commissioner, T.C. Memo. 1999-6.

What constitutes adequate substantiation for challenged
deductions, of course, is fertile ground for disputes between a
taxpayer and respondent, and we recognize that the nature and
quantum of substantiation for a given deduction can vary with
the circumstances.  Welch v. Helvering, supra.  Guidance
published by respondent identifies generally how a deduction may
be substantiated, but notes that proof that an expenditure was
made or incurred does not necessarily establish that a taxpayer
is entitled to a deduction for that expenditure.  Taxpayers are
advised to keep any other documents that may prove entitlement to
the deduction.  See Rev. Proc. 92-71, 1992-2 C.B. 437.
Furthermore, a taxpayer's self-serving declaration is generally
not a sufficient substitute for records.  See Weiss v.
Commissioner, T.C. Memo. 1999-17.

Respondent's position with respect to the disallowance of
deductions claimed on petitioners' returns flows from the
examination of those returns, and it is clear that a taxpayer's
return is hardly substantiation for items reported on that
return.  See Seaboard Commercial Corp. v. Commissioner, 28 T.C.
1034, 1051 (1957); Halle v. Commissioner, 7 T.C. 245, 247 (1946),
affd. 175 F.2d 500 (2d Cir. 1949).

According to petitioners, their hectic work schedules precluded them from filing timely individual tax returns for the years 1993 through 1995. Petitioners' 1993, 1994, and 1995 returns were not received by respondent until December 30, 1996, and then each was followed by an "amended" or "revised" version.

In addition to filing multiple versions of untimely tax returns, petitioners repeatedly failed to respond timely and adequately to respondent's numerous requests for information and documentation during the examination. Petitioners attribute these failures to their busy work and travel schedules. Petitioners complain of respondent's practice of issuing multiple IDRs for the same information, but ignore their own behavior as the reason for such multiple requests.

Nothing introduced at the hearing establishes that respondent's agents improperly or unreasonably failed to accept adequate substantiation for the deductions in dispute. Many of petitioners' claimed business expense deductions were for travel and entertainment. As previously noted, that type of expense is subject to strict substantiation requirements to be allowed as a deduction. As best as can be determined from the hearing record, petitioners provided little substantiation with respect to much of their travel and entertainment expense deductions. For example, petitioners provided only business cards to substantiate the business purpose of some claimed travel expenses.

Petitioners had no receipts for amounts deducted as travel expenses that were allegedly paid to their daughter in exchange for travel coupons. Many questions were raised by the revenue agent regarding petitioner's reimbursements for University-related travel, but petitioners delayed responding to those questions, or failed completely to do so, even though an investigation by the University focused upon those reimbursements.[17]

From their presentation at the hearing, it appears that petitioners, for the most part, consider the "general ledgers" provided to the examining agents as adequate substantiation for the challenged deductions. Ignoring for the moment inconsistencies from version to version, the "general ledgers" provided little support for the challenged deductions. The "general ledgers" lacked meaningful descriptions of the listed expenditures or their business purpose, and, on an item by item basis, the amounts reported on the "general ledgers" often did not support the amounts reported on any of the returns submitted by petitioners. Contrary to the significance that petitioners attribute to the "general ledgers", in many ways, those documents actually support respondent's requests for additional information for certain deductions inasmuch as entries contained in the

---

[17] Petitioner was given the opportunity at the hearing to be recalled as a witness to explain the nature of the University's investigation, but she chose not to do so.

"general ledgers" suggest that petitioners improperly deducted: (1) Personal items as business expenses; (2) actual travel expenses in addition to per diem amounts; and (3) mortgage payments, automobile payments, and home furnishings as "job travel" expenses. Furthermore, the "general ledgers" were continually revised during the examination of petitioners' returns. This suggests that petitioners did not keep these records contemporaneously with their expenditures or that entries originally made were in some manner or another erroneous. Respondent properly requested supporting documentation for entries made in the "general ledgers", but some requests were ignored and many responses were delayed.

A taxpayer's poorly detailed and noncontemporaneous records are hardly proper substantiation for challenged deductions, and secondary sources, such as petitioners' "general ledgers", offered in support of a taxpayer's business expense deductions need not be accepted by respondent or this Court. See Krieger v. Commissioner, T.C. Memo. 1993-347, affd. without published opinion 64 F.3d 657 (4th Cir. 1995); Bard v. Commissioner, T.C. Memo. 1990-431; Farguson v. Commissioner, T.C. Memo. 1983-615.

Under the circumstances, including the confusion no doubt caused by the use of similar acronyms for different entities, we find no fault with respondent's refusal to accept the "general ledgers" and other information provided by petitioners as

adequate substantiation for the business expense deductions disallowed in the notice of deficiency.  Taking into account controlling legal precedent and based on the facts available to respondent when the notice of deficiency was issued, as well as when the answer was filed, we find that respondent's position that results from that refusal has a reasonable basis in law and fact and therefore is substantially justified.  See Maggie Mgmt. Co. v. Commissioner, 108 T.C. at 443.

Our conclusion on this point is not altered by the fact that a settlement was achieved after "mock-up" tax returns that differed from all of the returns previously submitted by petitioners and additional substantiation were provided and reviewed by respondent's counsel.  See Harrison v. Commissioner, 854 F.2d 263, 265 (7th Cir. 1988), affg. T.C. Memo. 1987-52; Wickert v. Commissioner, 842 F.2d 1005 (8th Cir. 1988), affg. T.C. Memo. 1986-277.

II.  The "Deferred Income" Issue

In the notice of deficiency and in his answer, respondent takes the position that $195,000 of licensing fees received by ISOA, Inc., are includable in its income in the year received. According to petitioners, respondent has failed to establish that his position has a reasonable basis in law.  Petitioners argue that respondent's position is, therefore, not substantially justified.

For the taxable years in issue, ISOA, Inc., was an S corporation that prepared its tax returns on the cash basis method of accounting. On its 1995 return, ISOA, Inc., treated $195,000 of licensing fees received during the taxable year as "Unearned Income (Escrow)". Petitioners claimed that ISOA, Inc., did not include the $195,000 of licensing fees it received in taxable income due to the fact that the royalties the corporation owed would not ultimately be paid until a final agreement was reached with the University. Therefore, petitioners argued, the full amount of the licensing fees which ISOA, Inc., would retain could not be determined at the time of receipt.

Once again, respondent's position on this issue calls into play fundamental principles of Federal income taxation. As a general rule, a cash basis taxpayer recognizes income in the year of receipt. Sec. 451(a); sec. 1.451-1(a), Income Tax Regs. Exceptions to this general rule exist for amounts properly characterized as deposits or amounts held in trust that might have to be returned. See, e.g., Commissioner v. Indianapolis Power & Light Co., 493 U.S. 203, 207-208 (1990); Johnson v. Commissioner, 108 T.C. 448, 467-475 (1997), affd. in part, revd. in part and remanded on another ground 184 F.3d 786 (8th Cir. 1999). Unless received under a claim of right, "a taxpayer need not treat as income moneys * * * which were not his to keep, and which he was required to transmit to someone else as a mere

conduit." Diamond v. Commissioner, 56 T.C. 530, 541 (1971),
affd. 492 F.2d 286 (7th Cir. 1974). Receipts subject to the
taxpayer's claim of right are includable in the taxpayer's income
in the year of receipt. N. Am. Oil Consol. v. Burnet, 286 U.S.
417, 424 (1932). A taxpayer has a claim of right to income if
the taxpayer: (1) Receives the income; (2) has control over the
utilization and disposition of the income; and (3) asserts a
"claim of right" or entitlement to the income. Id. at 424.

Over the course of the examination, petitioners maintained
several different positions with respect to ISOA, Inc.'s
treatment of the licensing fees as "deferred income". In 1997,
petitioners' original position with respect to the "deferred
income" was that the amount was being "held for payment of $1.5
million buyout of intellectual property" from the University.
Later, in August 2000, petitioners maintained the position that
the "deferred income" represented accumulated royalties owed to
the inventors of the underlying intellectual property. At trial,
Ms. Stephenson also testified that the licensing fees were
treated as "deferred income" because they were subject to being
refunded to the licensees. We also note that, on August 1, 2000,
just prior to respondent's notice of deficiency sent on October
19, 2000, Ms. Stephenson stated that ISOA, Inc., was actually an
accrual basis taxpayer and that the proper accounting treatment

of the "deferred income" would have been "to recognize the royalty income when received and set up a corresponding payable to the inventors for the same amount."

Given petitioners' explanations, it was reasonable for respondent to take the position that ISOA, Inc., was not merely a conduit and that the $195,000 received by the corporation in 1995 was includable in taxable income in the year received. There was no question that the licensing fees were received by ISOA, Inc., in 1995 and deposited into the corporation's bank account. ISOA, Inc., had control over the utilization and disposition of these licensing fees and, in fact, paid related expenses from these licensing fees. There is no indication in the record that the licensing fees were ever deposited or segregated into any separate account. While ISOA, Inc., may have had an unfixed obligation to pay royalties to the inventors, the licensing fees were not required to be held until that time.

Accordingly, it was reasonable for respondent to take the position that ISOA, Inc., had dominion and control over the licensing fees and that such amounts were not held by the corporation merely as an agent or conduit. We find that respondent's position that the $195,000 of "deferred income" should have been included in ISOA, Inc.'s 1995 taxable income was a reasonable application of the law given the available facts and circumstances at the time that respondent took his position.

Because respondent's positions in the administrative and court proceedings were substantially justified, we need not decide whether petitioners unreasonably protracted the proceedings, or whether the administrative and litigation costs claimed by petitioners are reasonable.

We find that respondent's positions on the disputed issues were substantially justified.  Therefore, we hold that petitioners are not prevailing parties within the meaning of section 7430 and are not entitled to an award of administrative and litigation costs.

To reflect the foregoing,

<u>An appropriate order</u>

<u>and decision will be entered</u>.